

**FILED**

Dec 16 2016, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

John D. Papageorge
Steven C. Shockley
Jeffrey D. Stemerick
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Lynnette Gray
Johnson Gray & Johnson
Franklin, Indiana

Brian C. Bosma
Steven E. Runyan
Keven D. Koons
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Duke Energy of Indiana, LLC,

*Appellant-Plaintiff,*

*v.*

City of Franklin, Indiana,

*Appellee-Defendant.*

December 16, 2016

Court of Appeals Case No.
41A01-1607-CT-1549

Interlocutory Appeal from the
Johnson Superior Court
The Honorable Kevin M. Barton,
Judge

Trial Court Cause No. 41D01-1606-
CT-92

**Bradford, Judge.**

# Case Summary

Appellee-Defendant the City of Franklin, Indiana ("the City"), in cooperation with the State, has proposed a plan to revitalize and improve a stretch of Indiana State Road 44 ("SR 44") that serves a major east-west artery ("the Traffic Plan"). The Traffic Plan includes, *inter alia*, a proposal to connect the three-way intersection of County Club Lane and Longest Drive ("the Intersection") to SR 44. Appellant-Plaintiff Duke Energy of Indiana, LLC ("Duke") holds a utility easement in the land underneath the proposed Intersection expansion and requested a preliminary injunction to prevent the City from completing the expansion of the Intersection, contending the City lacks sufficient property rights to allow it to do so and that the expansion would impermissibly interfere with its easement rights. The trial court denied Duke's request for a preliminary injunction, and Duke now appeals. Because we conclude that Duke lacks standing to challenge the City's property interests in the real estate at issue and that the trial court did not abuse its discretion in concluding that Duke does not have a reasonable probability of success at trial, we affirm.

# Facts and Procedural History

The following excerpted diagram, submitted in un-excerpted form as Plaintiff's Exhibit 13, is helpful to understanding the issues presented by this case.



Job No. 8153.012
File No. T:\8k\8153\012\dwgs\CCL.dwg
Date 06/12/2016  KKE/GRK

This drawing is not intended to be represented
as a retracement or original boundary survey, a
route survey, or a Surveyor Location Report

Parcel Lines shown are approximate.  No field work
has been performed as a part of this exhibit.

Sheet 1 of 1

[3]     For a stretch in the City, Longest Drive and SR 44 (a/k/a King Street) run generally east-west and parallel, with Longest Drive being intersected by County Club Lane at the Intersection.  Duke holds the Easement, which runs north-south, encompasses the Intersection, and includes utility pole 825-4181, which is adjacent to and just northwest of the Intersection.  The Easement grants Duke the right to "construct, operate, patrol, maintain, reconstruct and remove an electric line, including necessary poles, wires, and fixtures attached thereto, for the transmission of electrical energy[.]"  Plaintiff's Exs. 18, 19.

[4] At issue is the Traffic Plan, by which the City intends to improve SR 44 between SR 144 on the west side and I-65 on the east. The Traffic Plan includes a proposal to provide access to SR 44 from the Intersection, as shown below:



Plaintiff's Ex. 11 (excerpt).

[5] Early in 2016, the City presented Duke with the Traffic Plan, and Duke informed the City that it believed that the expansion of the Intersection would unreasonably interfere with its easement rights. On June 7, 2016, Duke filed for a preliminary injunction to prevent the City from constructing the proposed expansion of the Intersection. The next day, the trial court entered a temporary restraining order—by which the City agreed to abide—pending resolution of the

preliminary injunction issue. On July 5, 2016, the trial court denied Duke's request for a preliminary injunction, ruling that Duke had failed to establish unreasonable interference with its easement rights. On this basis, the trial court concluded that Duke had failed to show a reasonable likelihood of success at trial and so denied Duke's request for a preliminary injunction. The trial court's order provides, in part, as follows:

> 5. The City's project … is designed to enhance the visual appearance of [SR 44] so as to encourage development on the east side of Franklin and to provide an attractive area for travelers on I-65 to stop for food and lodging. By [its] design, the project is meant to slow traffic on [SR 44].
>
> 6. In the area of Country Club Lane, [SR 44] is now a well traveled limited access four lane highway. [SR 44] connects Franklin to Interstate 65, which is a major north-south divided access highway.…
>
> 7. As part of the roadway improvement project, the City is opening access to Country Club Lane from both lanes of travel on [SR 44].… A stop sign will be added for eastbound traffic at Longest Drive that is entering Country Club Lane. A stop sign already exists for westbound traffic at Longest Drive and Country Club Lane.
>
> 8. Mayor McGuinness opined that opening and closing of access points from [SR 44] is designed to separate the commercial and residential uses of property along [SR 44] and to remove commercial traffic from residential streets.
>
> 9. City Engineer, Travis Underhill, testified that part of the goal of the overall corridor project is to safely manage increased traffic in the area and plan for future traffic and anticipated development. Mr. Underhill testified that from an engineering standpoint and safety standpoint, it is desirable to reduce commercial traffic through residential neighborhoods and

that the direct access routes as proposed will reduce conflict points for motorists.

10. A report prepared by HWC Engineering states that the change in access to [SR 44] is "to promote more efficient traffic movements along [SR 44]". Exhibit 6.

11. Country Club Lane provides access to a private country club known as Hillview Country Club. A tenant at Hillview Country Club is a public restaurant known as Scotty's Brew[house]. Scotty's Brew[house] opened in October of 2015. At all times relevant, a restaurant has been located at Hillview Country Club for the use of [its] members prior to the opening of the public restaurant. Country Club Lane is a private roadway.…

12. [SR 44] has existed on the east side of the City at all times relevant. [SR 44] connects Franklin with the City of Shelbyville to the east and the City of Martinsville to the west. Prior to 1970, [SR 44] was a two lane roadway. Access to Hillview Country Club was gained directly from [SR 44]. In 1970, the State of Indiana converted [SR 44] to a four lane limited access highway from I-65 to the older residential area on the eastside of Franklin. [SR 44] was shifted to the south. A new road, Longest Drive, was created to the north of [SR 44]. Longest Drive is generally an east-west access road that is parallel to [SR 44]. Access to Longest Drive was gained to the west of Country Club Lane at a short access road known as Milford Drive. A portion of Longest Drive was constructed on the roadbed of the pre-1970 [SR 44].

13. After the 1970 redesign, traffic to Hillview Country Club was required to exit [SR 44] on the north side at Milford Drive, immediately turn right onto Longest Drive, proceed east on Longest Drive to Country Club Lane and turn left or north onto Country Club Lane. Country Club Lane could not be accessed directly from [SR 44]. Longest Drive and [SR 44] were separated by a grassy strip.

14. Under the current roadway project, traffic would be able to proceed north from [SR 44] directly to Country Club Lane. West bound traffic on [SR 44] would be able to turn right onto Country Club Lane. A break would be created in the existing median on [SR 44] so that east bound traffic on [SR 44] would be able to access Country Club Lane. Approximately forty feet after exiting [SR 44], traffic would encounter Longest Drive. Longest Drive provides access to residential areas to the east and to the west of Country Club Drive that have been constructed since the 1970 redesign of [SR 44]. A stop sign would be added for east bound traffic on Longest Drive. The result of the City's redesign would change Longest Drive-Country Club Lane to a four way intersection and would be located just north of a three way intersection at Country Club Lane and [SR 44]. Traffic would be regulated by stop signs as opposed to use of automatic traffic control devices. The City's project would also introduce a pedestrian "trail" on the north side of [SR 44].

….

26. Utility pole 825-4181 is located at the intersection of Longest Drive and Country Club Lane. The pole is located inside the Easement and just north of the fee line of property acquired by the State of Indiana.

27. The City's project would alter the traffic flow past utility pole 825-4181. Traffic flow would change in the following manner:

A. Traffic accessing Hillview Country Club and Scotty's Brew[house] would come off of [SR 44]. Currently, traffic exits [SR 44] north onto Milford Drive, immediately turns right or east onto Longest Drive, proceeds east on Longest Drive an undetermined but relatively short distance and then turns left or north onto Country Club Lane. In addition, traffic could currently access Country Club Lane from an opening from [SR 44] to the east of Country Club Lane. However, the latter option is a less direct route through a condominium community. As a

result of the City's project, traffic accessing Hillview Country Club and Scott[y]'s Brew[house] would proceed onto Country Club Lane directly from [SR 44]. The Milford Drive exit from [SR 44] will remain open. Traffic could still access Hillview Country Club and Scott[y]'s Brew[house] in the same manner as before, but the assumption is that the public will prefer the more direct route. The exit from [SR 44] to the east at Franklin Cove Court would be closed. However, the public could still access Hillview Country Club and Scott[y]'s Brew[house] from the east by using a new exit further to the east onto Fairway Lakes Drive. The result of the changes would mean that traffic accessing Hillview Country Club and Scott[y]'s Brew[house] will proceed straight past pole 825-4181 as opposed to turning at the pole. Inasmuch as vehicles de[]ccelerate to turn, traffic would be proceeding faster past pole 825-4181 after completion of the City's project.

B. The success of Hillview Country Club is dependent upon expansion of membership. The success of Scotty's Brew[house] is dependent upon attracting customers. Scott[y]'s Brew[house] has placed information signs and directional signs on Interstate 65. Mayor McGuiness testified that the City's project is designed to create a situation for the improvement of business and commercial development on the east side of Franklin. Inasmuch as access to Hillview Country Club and Scott[y]'s Brew[house] will be easier for the public, there may be increased traffic flow past pole 825-4181 as a result of the City's project. Development on the eastside of Franklin will also cause an increase in traffic past pole 825-4181 without regard to whether access is directly provided from [SR 44].

C. A residential development is being developed to the northwest of Hillview Country Club. The residential development will be accessed from Eastview Drive, which is the first major arterial road that is accessed from [SR 44] west of the area at issue. A road will connect the residential development to a parking lot at Hillview Country Club and Scott[y]'s Brew[house]. Although Country Club Lane is a private

roadway, the public could utilize Country Club Lane and the parking lot to access the new residential development as well as Eastview Drive. Accordingly, traffic could increase past pole 825-4181 by reason of the connection of the residential development to the Hillview Country Club parking lot. However, the traffic flow caused by the residential development would likely be minimal inasmuch as Eastview Drive would offer a more favorable route of travel.

28. Duke asserts that the creation of the four way and three way intersections in immediate proximity to each other with the increased volume and speed of traffic proceeding past pole 825-4181 increases the hazard to which [its] repair and maintenance crews are exposed. The City asserts that the elimination of the two ninety degree turns required to access Country Club Lane will create a safer condition. Engineer Travis Underhill opined that turning a vehicle created a more hazardous condition than operating the vehicle in a straight line.

29. No evidence was submitted of vehicular collisions or collisions between a vehicle and utility pole 825-4181 or other poles in the area.

30. Duke's witness, Gary McNamee, acknowledged that the change proposed by the City's project will not affect Duke's use of the easement for the transmission and distribution of electricity except as it relates to the repair and maintenance of the electric lines.

31. Testimony was presented as to repair and maintenance work that would be required to be performed. Repairs would need to be made if a pole was damaged as a result of a collision by a motor vehicle or if an electrical line should come down as a result of a collision by a vehicle with a pole or weather related occurrences. Poles may need to be replaced due to deterioration of the pole.

32. In order to maintain and to repair electric lines, Duke utilizes bucket trucks and line trucks. The bucket trucks can reach a height of eighty (80) feet and have outriggers that

stabilize the vehicle while in use. Due to the outriggers, the truck would occupy more space than the truck would occupy without deployment of the outriggers. Stringing trucks could be required to hold a still energized line while the line is repaired. In instances in which a pole must be replaced, a crane may be utilized to lift a new pole into place. A flatbed truck would be required to transport the new pole. As part of the process of repairing or replacing a pole or an electric line, traffic in proximity to the pole would be subject to control so as to reduce the risk of harm to Duke's repair crews.

33. An increase in the speed and/or volume of traffic would increase the size and extent of the area that would be controlled so that Duke's maintenance or repair crew could safely perform their job.

34. Mr. McNamee testified that the more directions from which traffic is approaching a work zone, the more people that are required to control traffic. The more traffic that there is from different directions, the greater is the risk that the traffic cannot be controlled as well. Record, 6/14/2016, 10:56. The placement of a pole in proximity to a street means that a repair crew would be working in the street. Id., 11:14.

35. Mr. McNamee testified that the poles used in transmission lines are bigger. The trucks that carry the poles are bigger. The equipment used to install the poles is bigger. Due to the size of the pole and the position that it has to take as the pole is raised, it is more likely that both lanes of traffic must be shut down. Record, 6/14/2016, 10:57.

36. In a letter to City Engineer Travis Underhill and Mayor Joe McGuinness, Mr. McNamee stated that Duke does not allow intersections within [its] easements. He articulated the reasons as follows:

> "Intersections consume more space in the Duke Energy right-of-way, leaving less room for the line to be rebuilt or for use to add a line in this right-of-way should it be needed. Intersections reduce our ability to use the space

that has [been] purchased for current transmission lines and possible future new lines, whether they be permanent or temporary due to storm damage.

Intersections create a heavier traffic flow of vehicles and increase the risk of injury to Duke Energy crew members when they are working on power transmission lines. Any time utility work is performed in a vehicular traffic area, it increases the risk of injury. An intersection increases traffic and adds to the number of directions from which that traffic may approach the working crews.

Some intersections require more signage and traffic signals, which are also not permitted in the Duke Energy right-of-way. When a Duke Energy line is damaged, the intersection will likely need to be blocked during long repair times, and this would close access for some traffic. Repairing damaged transmission lines takes longer than repairing lower-voltage distribution lines due to their size and the fact that the equipment to do the work is not always in the immediate location of the damage."

Exhibit 25.

37. Marty Dickey, Manager of Transmission for Duke, testified that if pole 825-4181 were to be replaced, it would be replaced with a steel pole of either one or two pieces. The steel pole would be taller and weigh more than the existing wooden pole. A "lay down" area for preparation of the steel pole for installation would be required. Mr. Dickey opined that pole replacement would require closure of the roads in proximity to the pole, to-wit: Country Club Lane and Longest Drive, but he did not believe that the work would require closure of [SR 44]. Record, June 14, 2016, 1:17. If an intersection were installed at Country Club Lane, access to the area off of [SR 44] would need to be shut off as part of the closure. Id.

38. Mr. Dickey testified that the "more complex" the traffic situation, the more traffic control would be required. Mr. Dickey referred to a distance required for management of traffic

as defined by the speed and volume of traffic. He testified that traffic management could require directional signs and traffic control personnel to control traffic as opposed to use of traffic cones. However, Mr. Dickey did not render specific opinion as to how the proposed intersection would change traffic control.

39. Mr. Dickey referred to a pole replacement on Madison Avenue in Greenwood. The pole replaced carried both transmission and distribution lines. Distribution to customers in the area was not shut down. The pole replacement required that Madison Avenue, a major arterial street in Greenwood, be closed. So as to accommodate the desire of the City of Greenwood to minimize the disruption caused by closure of a major arterial street, the work was performed at night. The work was performed without endangerment to Duke crews.

40. No evidence was submitted of repairs or maintenance that had been conducted to pole 825-4181 or to the lines or other poles in proximity to pole 825-4181.

41. If warranted to protect [its] maintenance or repair crews, Duke will close a roadway so as to permit repairs or maintenance to be safely performed. Although the City has not been consulted on those occasions in which a road has been closed by Duke to repair an electric line or pole, the City was not opposed to closing roads to create a safe work environment for utility maintenance and repair crews. Three occasions were cited in which Duke had closed a public street for repairs.

42. Mr. McNamee also opined that the placement of the trail in proximity to a utility pole could be a safety factor. The trail should be at least twenty-five (25) feet from the utility pole. The weight from a bucket truck, line truck or crane could damage asphalt for a trail that is not constructed to handle the weight of such equipment. The damage would be a safety factor to pedestrians and bicycle traffic. No evidence was presented that the trail would affect Duke's use of the easement for the transmission and distribution of electricity or constitute a hazard to Duke's maintenance or repair crews.

43. The proposed trail would come no closer than seventy to eighty feet from pole 825-4181 but would pass underneath Duke's transmission lines. Exhibit 18. The trail would be further than 25 feet from pole 825-4181.

CONCLUSIONS

….

32. Duke adopted a policy in 2008 to exclude the introduction of intersections within [its] easements.

….

34. Duke had identified to the City the reasons for objecting to the intersection within the easement as a reduction in the usable area of the easement, increase of traffic and the risk of injury to repair crews and the introduction of signage and traffic controls within the easement. The evidence focused upon the increased risk of harm to repair crews.

35. The creation of a four point intersection in proximity to a three point intersection does increase the number of variables that are subject to being controlled. The volume and the speed of traffic will increase. In the event that repairs or maintenance must be performed to pole 825-4181 or in proximity to the pole, the risk to repair and maintenance crews is now controlled by road closure. In the event that repairs or maintenance must be performed to pole 825-4181 or in proximity to the pole after the introduction of the intersection into the easement, Duke would still regulate the risk of harm to repair and maintenance crews by road closure. The introduction of the intersection into the easement would necessitate additional traffic control measures, including blocking access to the area from [SR 44].

36. Duke asserts that the introduction of the intersection into the easement will increase the risk of harm to [its] repair crews. Intuitively, the placement of a four point intersection in such close proximity to a three point intersection and which is not regulated by an automatic traffic control device would seem to increase the risk of harm to people and property occupying the

intersection. Mr. Underhill, the City Engineer, opined that safety would be improved by eliminating the two ninety (90) degree turns for traffic going to Hillview Country Club and Scott[y's] Brew[house] and by keeping commercial traffic out of the residential area. However, Mr. Underhill did not specifically address the issue raised by Duke that the new intersection would create new variables so as to increase the risk of harm. Presumably, HWC Engineering and Mr. Underhill, as the engineers responsible for public safety, have determined that the new design does not unreasonably increase the risk of harm to people and property within the redesigned intersection.

37. The Court does not find that the ability of Duke to repair or to maintain [its] transmission lines would be affected by the introduction of the intersection into the easement. In order to repair or to maintain [its] electric lines, Duke may close a street. The most likely maintenance issue cited by Duke would be the replacement of pole 825-4181. Mr. Dickey testified that pole replacement would require that Longest Drive and Country Club Lane would need to be closed based upon the size of the equipment and the space required. He did not believe that [SR 44] would be impacted. The City's redesign would introduce a new point of access from [SR 44]. The new point of access would need to be blocked. Inasmuch as the repairs and maintenance would require the closure of the road, the ability of Duke to perform repairs and maintenance would continue as before.

....

41. Indiana has recognized that a titleholder of the servient interest can use the easement in any manner that does not "materially impair or unreasonably interfere with the use of the easement by the dominant estate holder." Brown v. Heidersbach, 172 Ind. App. 434, 442, 360 N.E.2d 614, 620 (Ind. Ct. App. 1977)(citing Smith v. Holloway, 124 Ind. 329, 24 N.E. 886 (1890)).

42. Indiana has not recognized Section 4.12 of the Restatement of the Law, Third, Property (Servitudes). The City's interference with Duke's Easement is not measured by the City coming upon Duke's Easement but whether the City interferes with the grant of use, including repair and maintenance, under the Easement. The limitation upon the titleholder is that the titleholder not "materially impair or unreasonably interfere" with the use of the easement. Logically, those who hold right of use under the titleholder, including a public right-of-way, would be subject to the same standard for interference with Duke's right of use under grant of Easement of material impairment or unreasonable interference. The unreasonable interference standard is the same as set forth in the Restatement of the Law, Third, Property (Servitudes).

43. The Court does not conclude that there has been a showing of material impairment, unreasonable interference or irreconcilable conflict. As noted, the risk of harm is subject to traffic regulation through road closure. The risk of harm is also subject to regulation by the time at which the work would be performed. Country Club Lane serves a private country club and a public restaurant with set operating hours. The repair and maintenance work can be carried out at time when the businesses are closed. Inasmuch as Duke can and does close an area to traffic to perform repairs and maintenance, Duke is essentially arguing that the proposed intersection could increase the disruption to the public from the closure of the road to perform repairs or maintenance. Duke's assertion may be valid, however, the issue is the interference with Duke's right of use under grant of easement. At best, additional traffic control measures may be required. The Court does not conclude that this rises to the level of material impairment, unreasonable interference or irreconcilable conflict. Insofar as the changed public right of way is affected by the Duke easement by additional traffic control measures, these factors are considerations by the City in determining whether to change the public right-of-way.

….

47.  In determining that the proposed intersection would not interfere with Duke's ability to repair or to maintain [its] transmission lines, the Court notes that no evidence was submitted of the frequency or length of time required for repairs or maintenance.  No evidence was submitted that repairs had ever been performed in proximity to pole 825-4181.  Based upon deterioration of physical equipment over time and technological change, it is reasonable to assume that repairs are required.  No evidence was presented as to the frequency of repairs or maintenance except for it being an eventual possibility.  Evidence was not presented as to the length of time to conduct repairs.  The most likely maintenance required was the replacement of the pole.  The pole on Madison Avenue in Greenwood was replaced during a night time project.

….

53.  The appropriate standard for a preliminary injunction is that "the moving party must demonstrate by a preponderance of the evidence: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. (Citations omitted)."  Central Indiana Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 727 (Ind.  2008).

54.  For the reasons hereinabove set forth, the Court does not find that Duke has established a reasonable likelihood of success at trial.

IT IS THEREFORE ORDERED BY THE COURT, That the Plaintiff's Motion for Preliminary Injunction is DENIED.

Order pp. 2-5, 8-13, 21-22, 23-24, 25, 26-27.

# Discussion and Decision

[6] "The grant or denial of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion." *Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002) (citing *Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co.*, 492 N.E.2d 686, 688 (Ind. 1986)).

> When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. The trial court's judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them.

*Hydraulic Exch. & Repair, Inc. v. KM Specialty Pumps, Inc.*, 690 N.E.2d 782, 785 (Ind. Ct. App. 1998) (citations omitted). We also determine whether the trial court's conclusions are contrary to law. *See Carson v. Ross*, 509 N.E.2d 239, 241 (Ind. Ct. App. 1987), *trans. denied*. "We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment." *Hydraulic Exch. & Repair*, 690 N.E.2d at 785. Although we defer substantially to the trial court's findings of fact, we review questions of law de novo. *Mayer v. BMR Props., Inc.*, 830 N.E.2d 971, 978 (Ind. Ct. App. 2005).

[7] > In order to obtain injunctive relief, appellee had the burden of showing that: 1) its remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action; 2) it had at least a reasonable likelihood of success at trial

by establishing a prima facie case; 3) its threatened injury outweighed the potential harm to appellant resulting from the granting of an injunction; and 4) the public interest would not be disserved.

*Harvest Ins. Agency*, 492 N.E.2d at 688. "If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion." *Ind. Fam. & Soc. Servs. Admin.*, 769 N.E.2d at 161.

[8] Duke makes two claims related to its contention of a reasonable likelihood of success on the merits should the matter proceed to trial: (1) the City should not be able to expand the Intersection because it does not have adequate property interests in portions of the land and (2) the proposed expansion of the Intersection unreasonably burdens its rights pursuant to the Easement.

## I. Whether Duke Has Standing to Challenge the City's Interests to Land Involved in the Traffic Project

[9] Duke is claiming that the City may not expand the Intersection because it does not have sufficient property rights in the land at issue. Put another way, Duke is essentially pursuing an ejectment action against the City based on alleged trespass. The City argues that, even if one assumes that it does not have rights sufficient to allow it to expand the Intersection, Duke, as a mere easement holder, may not exclude the City on that basis.

[10] It is settled law that "in a trespass claim a plaintiff must prove that he was in possession of the land and that the defendant entered the land without right." *Aberdeen Apts. v. Cary Campbell Realty All., Inc.*, 820 N.E.2d 158, 164 (Ind. Ct.

App. 2005) (citation and quotation marks omitted), *trans. denied*. "We are also mindful of the traditional rule that an action for trespass to real estate 'cannot be maintained for an invasion of a right of way or easement.'" *Ind. Mich. Power Co. v. Runge*, 717 N.E.2d 216, 227 (Ind. Ct. App. 1999) (quoting *State ex rel. Green v. Gibson Circuit Ct.*, 246 Ind. 446, 449, 206 N.E.2d 135, 137 (1965)). "'This rule is based upon the principle that trespass actions are possessory actions and that the right interfered with is the plaintiff's right to the exclusive possession of a chattel or land.'" *Id.* (quoting *Green*, 246 Ind. at 449, 206 N.E.2d at 137). Duke does not dispute that its interest in the parcels at issue is non-possessory, nor does it argue that cases such as *Indiana Michigan Power* and *Green* are no longer good law. Whatever defects in the City's title may exist, Duke may not exclude the City (or any other entity) from the Intersection or challenge the construction of the Intersection on that basis.

## II.  Whether the Traffic Plan Would Unreasonably Burden Duke's Enjoyment of its Utility Easement

[11] The only remaining question is whether expanding the Intersection would impose an impermissible burden on Duke's easement rights.

> Indiana cases clearly have held that the owner of an easement possesses all rights necessarily incident to the enjoyment of the easement, and that he may make such repairs, improvements, or alterations as are reasonably necessary to make the grant of the easement effectual. *Board of Commissioners of Vanderburgh County v. Joeckel*, (1980) Ind. App., 407 N.E.2d 274, *trans. denied*; *Holding v. Indiana & Michigan Electric Co.*, (1980) Ind. App., 400 N.E.2d 1154; *Mercurio v. Hall*, (1924) 81 Ind. App. 554, 144 N.E. 248.

> Although these cases involve controversies between the dominant and servient owners, we believe they are applicable to the present dispute between co-owners of an easement.
>
> The general rule appears to be that where there are several owners in common of an easement, each owner has a right to make reasonable repairs, alterations, and improvements to the easement so long as such do not injuriously affect his co-owner. *Hultzen v. Witham*, (1951) 146 Me. 118, 78 A.2d 342; *Mehene v. Ball*, (1959) 22 Misc. 2d 577, 194 N.Y.S.2d 28; *Cain v. Aspinwall-Delafield Co.*, (1927) 289 Pa. 535, 137 A. 610; *Stifel v. Hannan*, (1924) 95 W.Va. 617, 123 S.E. 673. Stated conversely, an owner in common of an easement may not alter the land in such a manner as to render the easement appreciably less convenient and useful for one of his co-owners. *Goss v. Johnson*, (1976) Iowa, 243 N.W.2d 590; *Big Cottonwood Tanner Ditch Co. v. Moyle*, (1946) 109 Utah 213, 174 P.2d 148; 25 Am. Jur. 2d, *Easements*, § 88 (1966). Thus, the issues to be examined are the reasonable necessity to the enjoyment of the easement and the injurious effect on other co-owners, the latter being of significance because courts have not interfered with alterations or improvements unless it was made to appear that the objecting party would be seriously inconvenienced in his own use of the easement. *Hultzen.*

*Litzelswope v. Mitchell*, 451 N.E.2d 366, 369-70 (Ind. Ct. App. 1983).

[12] At the very least, the City claims a right-of-way to construct the Intersection on the real estate at issue, which, as mentioned, is a claim Duke lacks standing to challenge. The issues we must examine, then, are the reasonable necessity of the Intersection to the City and the injurious effect it would have on Duke.

[13] The trial court made several findings regarding the reasonable necessity of the expansion of the Intersection:

> (1) the Traffic Plan, of which the Intersection expansion is a part, is designed to enhance the visual appearance of SR 44 to entice travelers on I-65 to stop for food and lodging;
>
> (2) the Traffic Plan is designed to slow traffic on SR 44 and separate commercial and residential traffic in the area, which are positive developments from an engineering and safety standpoint;
>
> (3) additional access points on SR 44 would reduce conflict points for motorists;
>
> (4) access to Scotty's Brewhouse and Hillview County Club from SR 44 would be more direct and faster;
>
> (5) the Traffic Plan is designed to spur business and commercial development on the east side of the City; and
>
> (6) the Intersection would provide better access, via County Club Lane, to a residential development northwest of the Hillview Country Club.

In summary, the Intersection expansion is one part of a City effort to beautify the SR 44 corridor on the east side, enhance motorist safety, and spur commercial and business growth. Denying the City the ability to expand the Intersection would prevent it from fully implementing the Traffic Plan. Taken together, the findings support a conclusion that the Traffic Plan in general, and the proposed expansion of the Intersection in particular, are reasonably necessary uses of the City's right-of-way as they relate to implementation of the Traffic Plan.

[14] The other side of the coin is the injurious effect the expansion of the Intersection would have on Duke. Duke's argument in this regard focuses primarily on its claims that any repair to or replacement of its equipment near the Intersection would be more expensive and also more hazardous to its

employees were the Intersection to be expanded. The trial court made the following findings related to Duke's claims:

(1) no evidence was submitted of any repair or maintenance that had been done to pole 825-4181 or any nearby equipment;

(2) Duke had in the past, when warranted, closed roadways temporarily in order to perform maintenance, a practice to which the City has no objections;

(3) should pole 825-4181 have to be replaced at some point, Country Club Lane and Longest Drive, but not SR 44, would have to be closed;

(4) replacement of pole 825-4181 would, however, require closure of access from the Intersection to SR 44 if the Intersection were expanded;

(5) the Manager of Transmission for Duke testified that traffic management of the expanded Intersection could require directional signs and personnel but did not render a specific opinion on how the proposed expansion would change traffic control;

(6) working at night, Duke replaced an electrical pole in Greenwood which required the closure of Madison Avenue, a major arterial roadway, a procedure that did not endanger repair crews; and

(7) the location of a proposed bicycle and pedestrian trail would not be close enough to pole 825-4181 to be a safety risk.

[15] Based on the above findings, the trial court concluded that Duke's ability to repair and maintain its transmission lines would not be affected by expansion of the Intersection. The trial court noted that the most likely maintenance would be replacement of pole 825-4181, which would require closing the entire Intersection whether or not it was connected to SR 44. The trial court also noted that Country Club Lane served Hillview Country Club and Scotty's

Brewhouse, both businesses with set hours, meaning that maintenance could be scheduled when both were closed and traffic in the area was diminished. The trial court concluded that Duke's ability to maintain its property in its easement would be unaffected with the possible exception that some additional traffic control measures may be required. The record, however, contains no solid evidence on the additional costs or risks of temporarily closing a four-way intersection as opposed to a three-way.

[16] Under the circumstances of this case, we cannot say that the trial court's conclusion amounts to an abuse of discretion. On the whole, the trial court's findings, which were all supported by evidence in the record, were more than enough to support a conclusion that the reasonable necessity of the Intersection's expansion outweighed whatever injurious effect that expansion would have on Duke's enjoyment of its easement. Because the trial court did not abuse its discretion in concluding that Duke did not establish a reasonable likelihood of success at trial, it also did not abuse its discretion in denying its request for a preliminary injunction.

# Conclusion

[17] We conclude that Duke, as a mere utility-easement holder, lacks standing to maintain an ejectment action against the City on the basis that the City does not have sufficient property rights to expand the Intersection. Moreover, we conclude that the trial court did not abuse its discretion in determining that Duke failed to show a reasonable likelihood of success at trial. Consequently,

the trial court did not abuse its discretion in denying Duke's request for a preliminary injunction against the City.

[18] We affirm the judgment of the trial court.

Pyle, J., and Altice, J. concur.