

**FILED**

Mar 06 2019, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael L. Carmin
Carminparker, PC
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Ryan J. Vershay
A. Richard M. Blaiklock
Derek G. Raymond
Lewis Wagner, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Craig Newforth and Marcia Newforth, <br><br> *Appellants-Defendants*, <br><br> v. <br><br> Jason Bault, <br><br> *Appellee-Plaintiff*. | March 6, 2019 <br><br> Court of Appeals Case No. 60A05-1712-PL-2969 <br><br> Appeal from the Owen Circuit Court <br><br> The Honorable Elizabeth Cure, Special Judge <br><br> Trial Court Cause No. 60C02-1609-PL-343 |

**Brown, Judge.**

[1] Craig and Marcia Newforth appeal the trial court's order determining the extent of an easement over some of their property. The Newforths raise two issues which we restate as whether the judgment is clearly erroneous. We affirm.

*Facts and Procedural History*

[2] Jason Bault operates a mulch business and owns approximately five acres in Owen County, Indiana (the "Bault Property"). State Road 43 is located along the eastern boundary of the Bault Property. Bault also owns several parcels (the "Northern Bault Parcels") located north of the Bault Property. Checkered Racing owns a parcel (the "Checkered Racing Parcel") west of the Bault Property. The Newforths own real property containing approximately 19.55 acres ("Newforth Property") west of the Checkered Racing Parcel from which they operate a trash service, and they own a fifty-foot-wide strip of land containing 0.88 acres (the "Easement Area") subject to an easement (the "Easement") which extends from the 19.55-acre property eastward along the southern boundary of the Checkered Racing Parcel and the Bault Property to intersect with State Road 43. A gravel industrial access road (the "Access Road") is located in the Easement Area. Bault has an agreement with Checkered Racing pursuant to which he may access the Northern Bault Parcels using the Checkered Racing Parcel. The Newforth Property, Bault Property, and Northern Bault Parcels are part of Franklin Industrial Park.

[3] By way of background, Cheryl Franklin conveyed property of approximately five acres to Jim Sinders by deed dated March 5, 1998, and recorded March 10, 1998 (the "Franklin Deed"). The Franklin Deed also granted the Easement to

Sinders and included a legal description of the Easement Area. A plat for

Franklin Industrial Park executed by Cheryl Franklin and recorded on

December 11, 2000, depicts the five-acre parcel conveyed to Sinders (which is

now the Bault Property), a 19.55-acre parcel (which is now the Newforth

Property), the Easement Area, and other parcels adjacent to the Easement

Area. The 2000 plat in the record depicts the following:



*See* Exhibit 3.[1] Sinders conveyed the five-acre parcel and his right to use the Easement to John and Peggy Tucker by deed dated August 16, 2006, and recorded August 18, 2006 (the "Tucker Deed"). An amended plat of Franklin Industrial Park was recorded in May 2009 depicting the five-acre parcel owned by the Tuckers (now the Bault Property), the land owned by Cheryl Franklin, and the 0.88-acre Easement Area.

[4] Cheryl Franklin conveyed property to the Newforths by deed dated June 28, 2011, and recorded June 29, 2011 (the "Newforth Deed"), which included the Newforth Property of approximately 19.55 acres and the 0.88-acre Easement Area. The Newforth Deed conveyed the Easement Area "[s]ubject to an affirmative duty to maintain the easement from the 19.55 acre tract to State Road 43 for the benefit of the 19.55 acre tract and the adjacent parcels abutting the easement as shown on" the 2000 plat. Exhibit 5. The Tuckers conveyed their five-acre parcel and rights under the Easement to Bault by deed dated April 29, 2016, and recorded June 13, 2016 (the "Bault Deed"). The southern boundary of the Bault Property coincides with the northern boundary of the Easement Area.

[5] At some point, Bault approached Craig Newforth about installing drives over a part of the Easement Area in order to connect the Bault Property to the Access Road, and Craig Newforth objected. On September 12, 2016, Bault filed a

---

[1] The arrows and names of the Checkered Racing Parcel, the Newforth Property, the Bault Property, State Road 43, and the Easement Area are supplied by this Court.

complaint seeking declaratory relief and an injunction. Bault alleged a shallow ditch separated his property from the Access Road, that access to and from his property by semi tractor trailer vehicles is reasonable and necessary for his mulch business, and that he desires to install at his expense a culvert pipe and two graded gravel areas within the Easement Area. He requested a permanent injunction enjoining the Newforths from interfering with his rights.

[6] On December 9, 2016, at Bault's request the trial court conducted a site visit with the parties, and in September 2017, it held a bench trial. Bault presented numerous exhibits including the relevant recorded instruments, the Owen County zoning ordinance and comprehensive plan, proposed drive illustrations, traffic notes, and photographs of the Easement Area, his vehicles and mulch operation, and the access drives of other mulch businesses. Bault presented evidence related to the volume and types of vehicles which would use the access drives and proposed a design of two forty-foot-wide drives, a forty-five-foot apron on the east side of each drive,[2] and a fifteen-foot apron on the west side of each drive, and he presented evidence regarding the reasons for his proposed design.

[7] On November 14, 2017, the court entered Findings of Fact, Conclusions of Law and Judgment. It found that Bault's rights under the Easement include the

___

[2] "The 'apron' is the area on either side of a driveway which flares wider at its connection point with the roadway (here, the Access Road) [and] is intended to allow turning vehicles additional maneuvering space as they negotiate the turn." Appellants' Appendix Volume 2 at 23.

right to utilize the entire Easement and Access Road for vehicular access to and from the Bault Property; the right to install two one-hundred-foot-wide access areas which are reasonably necessary to Bault's use and enjoyment of the Easement; the right to install a drainage culvert under each access area; and the right to utilize the Easement and Access Road for vehicular access by Bault's heavy equipment vehicles to and from the Northern Bault Parcels via the Checkered Racing Parcel. The court found that the terms of the Easement are clear and unambiguous, permit Bault's intended installation of the access areas, and do not restrict the manner in which he can use and develop the Bault Property, the type and size of vehicles he and his customers can utilize, the type and size of drives or access areas he can install within the Easement Area, or his use of the Easement for his heavy equipment vehicles to access the Northern Bault Parcels via the Checkered Racing Parcel.

[8] The court further found it was reasonably foreseeable at the time the Easement was created that it would be utilized by semi tractor trailers and heavy equipment vehicles. It found that Bault's intended use will not subject the Newforth Property to extra burdens or materially impair or unreasonably interfere with the Newforths' use and enjoyment of the Newforth Property. It found that Bault's anticipated annual volume of vehicles is reasonably foreseeable, permissible, and consistent with the historical use of the Access Road and Franklin Industrial Park, and that his rights under the Easement include the right to utilize the entire 0.88-acre, fifty-foot-wide Easement for vehicular access to and from the Bault Property. The court also found that

Bault may use the Easement and Access Road for vehicular access by his heavy equipment vehicles to and from Northern Bault Parcels via the Checkered Racing Parcel for as long as the current owner of the Checkered Racing Parcel allows such access.

[9] Other findings are that a drive width of forty feet is reasonably necessary for semi tractor trailers to safely and sufficiently enter and exit the Bault Property, an eastern apron of forty-five feet in width is reasonably necessary for the vehicles to enter and exit the Bault Property to and from the east via the Access Road and State Road 43, and a western apron of fifteen feet is reasonably necessary for Bault's heavy equipment vehicles to safely and sufficiently exit the Bault Property to the west toward the Checkered Racing Parcel and the Northern Bault Parcels at all times of day and in all weather conditions. The court found the total width of the access areas allows semi tractor trailers to enter the Bault Property without having to swing into the oncoming lane of traffic in the Access Road or the access area which would present a safety risk and create traffic conflicts. Further the court found that Bault established by clear and convincing evidence that a second drive prevents vehicles from backing up on the Access Road and potentially State Road 43, promotes more efficient internal traffic flow on the Bault Property, and creates less stress on the semi tractor trailers and their tires, and enjoined the Newforths from interfering with Bault's rights under the Easement.

## Discussion

In entering declaratory judgment for Bault, the trial court issued findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. Our standard of review is well-settled:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010) (citations omitted), *reh'g denied, trans. denied*. The Newforths are appealing from an adverse judgment, and the trial court's findings are clearly erroneous if they are not supported by substantial evidence of probative value. *See id*. We will affirm a judgment where we find substantial supporting evidence, unless we are left with a definite and firm conviction that a mistake has been made. *Id*.

The Newforths assert that the extension of the right to use the Easement for access to property not identified as the benefited property or dominant estate of

the easement, namely, the Northern Bault Parcels, is an improper extension of the easement and overburdens the easement. They argue: "The design characteristics are not in dispute with the exception of the fifteen foot (15') apron, the sole purpose of which would allow traffic to exit the Bault Real Estate westbound, which is an improper enlargement of the easement." Appellants' Brief at 17. Further, the Newforths argue that the genesis of Bault's desire for two drives was his unspecified plans for stockpiling mulch on his five-acre parcel, and that he provided nothing demonstrating a layout for stockpiling mulch or why two drives allow greater utilization of his land than one drive.

[12] Bault maintains the Newforths do not contend on appeal that any ambiguity exists in the terms of the Easement. He argues that Checkered Racing has consented to his use of its parcel to access the Northern Bault Parcels and that the Easement does not require the Newforths' consent. Bault further maintains that the evidence supports the conclusion that the second drive is reasonably necessary for his use of the Easement and that a second drive avoids damaging vehicles and equipment, promotes traffic flow and safety on the Access Road and State Road 43, allows him to store additional mulch, is common in the mulch industry, and is consistent with the Easement's purpose of permitting industrial vehicles safe and sufficient access to and from the rural industrial park parcels. He also argues that the fifteen-foot western aprons and use of the Checkered Racing Parcel enable him to keep his slow-moving heavy equipment vehicles off of State Road 43 which would impede the flow of traffic and present a risk to driver safety.

[13] The owner of an easement, known as the dominant estate, possesses all rights necessarily incident to the enjoyment of the easement. *Rehl v. Billetz*, 963 N.E.2d 1, 6 (Ind. Ct. App. 2012) (citing *Kwolek v. Swickard*, 944 N.E.2d 564, 570 (Ind. Ct. App. 2011) (citing *McCauley*, 928 N.E.2d at 313), *trans. denied*). The owners of the property over which the easement passes, known as the servient estate, may use their property in any manner and for any purpose consistent with the enjoyment of the easement, and the dominant estate cannot interfere with the use. *Id.* All rights necessarily incident to the enjoyment of the easement are possessed by the owner of the dominant estate, and it is the duty of the servient owner to permit the dominant owner to enjoy the dominant owner's easement without interference. *Id.* The servient owners may not so use their land as to obstruct the easement or interfere with the enjoyment thereof by the owner of the dominant estate. *Id.* at 6-7. Moreover, the owner of the dominant estate cannot subject the servient estate to extra burdens, any more than the holder of the servient estate can materially impair or unreasonably interfere with the use of the easement. *Id.* at 7.

[14] Indiana cases have held that the owner of an easement possesses all rights necessarily incident to the enjoyment of the easement, and that the owner may make such repairs, improvements, or alterations as are reasonably necessary to make the grant of the easement effectual. *Duke Energy of Ind., LLC v. City of Franklin*, 69 N.E.3d 471, 483 (Ind. Ct. App. 2016) (citing *Litzelswope v. Mitchell*, 451 N.E.2d 366, 369 (Ind. Ct. App. 1983) (citations omitted)). *See also Kwolek*, 944 N.E.2d at 571 ("The dominant estate holder may make repairs,

improvements, or alterations that are reasonably necessary to make the grant of the easement effectual.") (citing *McCauley*, 928 N.E.2d at 313); *Metcalf v. Houk*, 644 N.E.2d 597, 601 (Ind. Ct. App. 1994) ("The owner of the easement has a right to make such alterations and improvements as to make the grant effectual, provided, that an owner in common of an easement may not alter or use the land in such a manner as to render the easement appreciably less convenient and useful for other co-owners.") (citations omitted).

[15] The extent of the easement interest is determined by the purpose served by the easement. *Howard v. United States*, 964 N.E.2d 779, 781 (Ind. 2012) (citations omitted). Usually, easements arise to fill some need or serve some purpose. *Id.* (citing *Klotz v. Horn*, 558 N.E.2d 1096, 1099-1100 (Ind. 1990)). That purpose, whether expressed in the grant, implied, or acquired through prescription, is the focal point in the relationship which exists between the titleholders of the dominant and servient estates. *Id.* The servient estate is burdened to the extent necessary to accomplish the end for which the dominant estate was created. *Id.* *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 (2000) (the holder of the easement "is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude"); Comment b., § 4.10 ("In resolving conflicts among the parties to servitudes, the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the servitude beneficiary and the servient estate."); Comment e., § 4.10 (easement holder may construct improvements on the servient estate "subject to the proviso that the holder . . .

is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment"); Comment g., § 4.10 ("In determining whether a particular improvement will cause unreasonable damage to the servient estate, aesthetics and the character of the property are important concerns. . . . A use that is reasonable when both dominant and servient estates are agricultural in character may become unreasonable when they have become suburban.").

[16] When construing an instrument granting an easement, the trial court must ascertain and give effect to the intention of the parties. *McCauley*, 928 N.E.2d at 314. Any doubt or uncertainty as to the construction of the language of the easement will ordinarily be construed in favor of the grantee. *Id.* at 315 (citing *Metcalf*, 644 N.E.2d at 601).

[17] To the extent the Newforths do not challenge the trial court's findings of fact or conclusions, including those regarding Bault's proposed design of the access drives, we do not disturb those findings and conclusions.

[18] We observe, and the parties do not disagree, that the southern boundary of the Bault Property coincides with the northern boundary of the Easement Area. As such, the gravel access drives requested by Bault are located either on his own property or in the Easement Area and do not extend onto any property of the Newforths which is not subject to the Easement. The court found that, pursuant to the Easement, Bault has the right to use the entire 0.88-acre, fifty-foot-wide strip. The language of the granting instruments does not restrict the

width of the Access Road or limit the installation of drives which would connect the benefited parcels to the Access Road and allow vehicles to cross over the ditch or culvert. The Easement does not benefit the Newforth Property alone, which is clear from the instruments recorded prior to the Newforths' 2011 acquisition of their property. The Franklin Deed was recorded in 1998, the Tucker Deed was recorded in 2006, and the Easement is depicted on the 2000 plat and 2009 amended plat of Franklin Industrial Park. Moreover, the 2011 Newforth Deed expressly states that the 0.88-acre Easement Area is subject to the Easement "*for the benefit of* the 19.55 acre tract and *the adjacent parcels* abutting the easement" as shown on the plat recorded in December 2000. *See* Exhibit 5 (emphases added). On appeal, the Newforths do not challenge the trial court's rulings that Bault is granted access to his property from the Easement Area and that the installation of a drive over the ditch or culvert makes the grant effectual. Rather, the Newforths appear to limit their argument to Bault's use of the Checkered Racing Parcel to access the Northern Bault Parcels and the installation of a second access drive and the fifteen-foot western aprons.

[19] With respect to access to the Northern Bault Parcels, the trial court found:

> The Court finds Bault's rights under the [Easement] include the right to utilize the [Easement] and Access Road for vehicular access by his heavy equipment vehicles to and from Bault's Northern Parcels via the Checkered Racing Parcel for as long as the current owner of the Checkered Racing Parcel allows such access to his property. The Court finds neither the [Easement], nor the principles and case law cited above, prohibit or restrict

> Bault from utilizing the [Easement] and Access Road for this
> purpose. If Bault could access his Northern Parcels from his own
> land in the Franklin Industrial Park, it is hard to imagine that he
> would not be allowed to do so directly instead being forced to
> leave out the Newforth easement and going around on SR 43 to
> access the parcels from the SR itself. While Bault could not force
> Newforth to allow Bault to build an access solely for the purpose
> of accessing his Northern Parcels, once such an access is built,
> there is nothing the Court can find that states Bault cannot use
> the access road and area with permission of the owner of the
> property so accessed.

Appellants' Appendix Volume 2 at 33-34. The court also found, and the
Newforths do not dispute, that vehicular access between the Bault Property and
the Northern Bault Parcels "via the Checkered Racing Parcel and the Access
Road would enable Bault to keep his slow-moving heavy equipment off of S.R.
43, and would allow Bault to travel more safely and efficiently," "[t]he presence
of slow-moving heavy equipment on S.R. 43 impedes the flow of traffic on S.R.
43, and presents a potential risk to driver safety on S.R. 43," and "[f]rom a
traffic flow and safety standpoint, it is preferable for slow-moving heavy
equipment to avoid S.R. 43 and use an alternative route, such as the Access
Road and the Checkered Racing Parcel." *Id.* at 20-21.

[20] The Easement Area abuts both the Checkered Racing Parcel and the Bault
Property. To the extent Bault's agreement with Checkered Racing may result
in an increase in the volume of his vehicles using certain portions of the Access
Road, we observe the terms of the granting instruments do not limit the use of
the Easement based on the volume or types of vehicles using the Access Road

or the relative size or use of the benefited parcels or land adjoining the benefited parcels. The granting instruments do not require Bault and Checkered Racing to obtain the Newforths' permission to move vehicles or equipment between their properties.

[21] Also, the trial court found, and the Newforths do not dispute, that Franklin Industrial Park "was developed for industrial-type uses" and was originally developed around a sawmill which was operated on the Newforth Property, that the Newforth Property and the Easement Area are zoned "heavy industrial" and the Newforths operate a trash business on their property, that the Bault Property is zoned "agricultural" and the Owen County Zoning and Subdivision Control Ordinance effective in 2003 identifies "forestry" as a permitted use of a parcel zoned agricultural, that mulch is a product of the forestry industry and its cultivation is a process within the forestry industry, and that other parcels adjacent to the Easement are zoned "light industrial." *Id.* at 15, 17. Neither do the Newforths challenge the court's findings regarding Bault's use of semi tractor trailers or that the vehicles are an integral part of his fleet and necessary to his business. The court found that daily traffic volume on the Access Road is steady and that, on one day in 2017, ninety-nine vehicles used the Access Road including twenty-six trash trucks belonging to Newforth, nineteen semi tractor trailers accessing one of the parcels adjacent to the Easement Area, and eight heavy equipment vehicles belonging to Bault. The court found it is preferable for slow-moving heavy equipment to avoid State Road 43 and use a route such as the Access Road and Checkered Racing

Parcel. The court's finding that Bault may access the Northern Bault Parcels using the Easement and the Checkered Racing Parcel, for as long as the owner of the Checkered Racing Parcel allows such access, is not clearly erroneous.

[22] With respect to the installation of a second drive and the western aprons, the trial court found in part:

> 82. The Court finds that Bault established by clear and convincing evidence that a total of two (2) Access Areas are reasonably necessary to promote safety and facilitate traffic flow both in the Access Road and in the Access Areas. The Court finds that the evidence established that a second Access Area allows vehicles to enter the Bault Property whenever the first Access Area is blocked or impeded by a vehicle, which facilitates traffic flow on the Access Road and prevents vehicles from backing up on the Access Road and potentially S.R. 43. It became clear that a second Access Area is especially important considering the proximity of the Bault Property to S.R 43, the size and wide turning radius of Semi's, and because drivers sometimes park their Semi's in a driveway while asking for parking instructions.

> 83. The Court finds that Bault established by clear and convincing evidence that a second Access Area promotes more efficient internal traffic flow on the Bault Property, creates less physical stress on the Semi's and their tires, and allows Bault to store approximately two hundred (200) additional fifty-three foot (53') trailer loads of mulch material on the Bault Property.

*Id*. at 36. As for the western aprons, the court found that "a west apron of fifteen feet (15') of minimum width is reasonably necessary for Bault's heavy equipment vehicles to safely and sufficiently exit the Bault property to the west toward the Checkered Racing Parcel and Bault's Northern Parcels at all times

of day and in all weather conditions." *Id*. at 35. It also found that the total width of the drives allows semi tractor trailers to enter the Bault Property without having to swing into the oncoming lane of traffic in the Access Road or an access area which would present a safety risk and traffic conflicts.

[23] The evidence before the trial court supports its findings. Bault testified that he stores and grinds raw material into mulch, and that he purchased the Bault Property because he needed additional space to store bark inventory and process mulch. He stated that, when he runs out of room, he drives on the mulch and piles it high, which causes the mulch to become more compact and does not allow the material to breathe so heat does not escape and it burns. He stated that he uses wide rows with spaces between them and that the rows allow him to access, rotate, and turn over the mulch. He further indicated his plans to have a pond for irrigation on the northern part of his property which could be used for dyeing mulch or to extinguish fires. Bault stated that he could store approximately two hundred additional loads of mulch if he had a second drive, and that, with two drives, "I can bring my mulch, my raw material farther to him down the property so that I don't have to go all the way and turn around and go back out." Transcript Volume I at 149.

[24] Bault testified that "U-turns on trucks are hard," "we call it screwing a trailer in the ground," and that a second drive would avoid requiring a vehicle to back up. *Id*. at 167. He testified that it is damaging to drive through the ditch at an angle, that he planned to install culvert pipes to preserve the flow of water if any

in the ditch, and that he would pay to install and maintain the drives and the culvert.

[25] Sheila Reeves, the office manager at the Owen County Health and Building Department, testified that, from a planning and zoning standpoint, the use of semi tractor trailers at Franklin Industrial Park is foreseeable, Bault's installation of two drives is permissible in the Park under the 2003 ordinance, Bault's anticipated volume of semi tractor trailer loads in and out of the property is permissible, and Bault's intended use of his property is consistent with the purpose and present use of the Park and the 2003 ordinance.

[26] Bault also presented the testimony of Jeromy Grenard, a transportation engineer, who presented a design for the two access areas. Grenard indicated that the purpose of the aprons is for larger vehicles to negotiate turns into and out of the drives, the aprons are important for a larger vehicle which has a larger turning radius, and it is more important for narrow roads because there is not as much negotiation space available for a driver. He testified that there needs to be two drives for the maneuverability of multiple vehicles onto and off of the Bault Property from the Access Road and that there needs to be a forty-five-foot apron on the east side of the drives and a fifteen-foot apron on the west side of the drives. He testified that, in designing the drives, he used a software program standard in the transportation industry and that the software models the turning path, or swept path, of a selected vehicle based on the vehicle's design including its width, number of axles, distance between axles, and king pin location or hinge point.

## Conclusion

[27] There is no question that the Easement was intended to benefit the Bault Property and that, as the Easement Area and the Bault Property share a boundary, Bault's proposed drives are situated within the Easement Area and do not extend onto any property of the Newforths not subject to the Easement. The Easement was recorded in the 1998 Franklin Deed, the 2006 Tucker Deed, the 2011 Newforth Deed, and the 2016 Bault Deed, and it is depicted on the 2000 plat and 2009 amended plat of Franklin Industrial Park. Bault presented extensive testimony and evidence supporting the trial court's findings regarding Franklin Industrial Park, the impact of Bault's proposed drives, his access to the Northern Bault Parcels, and the installation of a second drive and the fifteen-foot aprons.

[28] Based upon the evidence as set forth above and in the record, and noting we do not reweigh the evidence and consider the evidence most favorable to the judgment, we conclude that the trial court's judgment is not clearly erroneous. *See Rehl*, 963 N.E.2d at 8 (holding the trial court did not err in entering findings related to the relative use or increased use of the area of an easement and noting that the parties presented evidence of the use and changes in the use of the easement area) (citing *McCauley*, 928 N.E.2d at 315 (holding that the trial court properly concluded the easement holders had the right to use the easement in its entirety and to construct a roadway over all or any part of the easement)).

[29] For the foregoing reasons, we affirm the judgment of the trial court.

[30] Affirmed.

Altice, J., and Tavitas, J., concur.