**NORTHERN INDIANA PUBLIC
SERVICE COMPANY,
Appellant–Defendant,**

v.

**G.V.K. CORP., Daniel Pivarnik, Edward
Pivarnik, and Robert Cauffman,
Appellees–Plaintiffs.**

No. 75A05–9612–CV–534.

Court of Appeals of Indiana.

June 9, 1999.

Rehearing Denied Aug. 9, 1999.

Paul A. Rake, Sherry L. Clarke, Robert Feldt, Lyle R. Hardman, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellant.

Theodore A. Fitzgerald, Petry & Fitzgerald, Hebron, Indiana, Glenn J. Tabor, Thomas F. Macke, Blachly, Tabor, Bozik & Hartman, Valparaiso, Indiana, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Once again, this case comes before us on appeal.[1] Appellant-defendant Northern Indiana Public Service Company (NIPSCO)

appeals from a jury verdict entered in favor of the appellees-plaintiffs G.V.K. Corporation (G.V.K.), Daniel Pivarnik (Daniel), Edward Pivarnik (Edward) and Robert Cauffman (collectively, the appellees), upon their complaint for negligence as a result of a gas explosion which occurred on the Pivarnik's farm. Specifically, NIPSCO contends that: 1) the trial court erred in realigning the appellees as plaintiffs and granting them a total of twelve peremptory challenges; 2) expert testimony with respect to Cauffman's injuries that was admitted into evidence but not disclosed to NIPSCO prior to trial violated its right of cross examination; 3) the trial court erred in failing to grant NIPSCO's motion to strike the appellees' request for punitive damages in a timely fashion; and 4) the trial court erred in denying NIPSCO's motion for summary judgment.

## FACTS

Daniel and Edward owned a farm as tenants in common in Porter county. In 1977, they had purchased the 117 acre farm from their father, which included a NIPSCO easement that had existed on the property for a number of years. That easement included a sixteen-inch buried gas main on the farm and granted NIPSCO a "right-of-way to lay, install, maintain, operate, repair, replace, and renew gas mains, and a line or lines of pipe for the transportation ... of gas ... in, upon, along and over a strip of land ... three (3) rods wide." Record at 4381.

Sometime in 1991, a biologist began working with the Pivarniks to develop a wetland restoration project with the U.S. Fish and Wildlife Service (the Agency). The Agency had instituted such a program to restore tile and ditch drained wetlands on private property. Daniel arranged to have a twenty-acre portion of the farm developed for wetlands in exchange for certain tax benefits and the government's payment of $3,000 for improvements to the property.

On Friday, April 19, 1991, the biologist, who was acting on the Agency's behalf, telephoned NIPSCO's "800" number to learn of

---

1. In *Pivarnik v. NIPSCO,* 636 N.E.2d 131, 139–40 (Ind.1994), our supreme court affirmed the trial court's judgment which determined, *inter alia,* that the Starke Circuit Court had acquired exclusive jurisdiction of all claims in this cause of action.

utility locations on the Pivarnik's farm. In response to the request, a NIPSCO gas pipeline locator went to the Pivarnik farm where he placed a row of yellow flags over NIPSCO's active gas transmission line, which was situated near the water. As no one was home at the time, the locator assumed that the excavation was going to occur at that location. The NIPSCO employee also discovered an inactive ten foot pipe farther away from the pond. At the time, the locator did not know that there were actually four NIPSCO pipelines buried on the property.

Several days later, Daniel telephoned the "800" number to also request utility locales for the project. The operator at NIPSCO informed him that the line had already been marked and instructed him to drive along the property to check for the flag markings. Thereafter, Daniel discovered the single row of flags that had been placed by the NIPSCO employee.

In late July, 1991, Daniel met with Dave Van Keppel, who was G.V.K.'s project supervisor and excavating contractor. Additionally, Cauffman, a conservation officer with the Department Of Natural Resources, and friend of the Pivarniks, walked the project area to assess the scope of the bulldozing work to be performed. As they examined the flag row that NIPSCO had marked, Daniel admonished Van Keppel not to bulldoze the area where the pipe was buried.

On August 2, 1991, Andy Systma, an employee of Van Keppel's, met Cauffman at the farm at approximately 10:00 a.m., with a bulldozer and backhoe. Cauffman had been earning extra compensation by assisting Daniel build a deck at the farm during his off-duty hours. Cauffman briefed Systma on the work that was to be performed, and specifically pointed to the gas line markings that were to be avoided. Cauffman informed Systma that he had prior experience operating heavy equipment, including bulldozers. Thus, Cauffman agreed to assist Systma by operating the bulldozer to push the piles of trees that had been pulled from the ground so that Systma would not have to alternate between machines. As the project commenced, Cauffman made three or four passes

through the area with the bulldozer. At one point, however, he struck the sixteen-inch, high pressure gas line, which was covered by approximately six to eight inches of soil. As a result of the impact, Cauffman and the bulldozer immediately became engulfed in flames. Systma assisted Cauffman and drove him back to the Pivarniks' home until the paramedics arrived.

The Porter Township Fire Department responded to the explosion, where two members of the department recalled seeing one row of yellow flags on the property. When department personnel returned the following day, however, the firefighters observed a second row of flags that had not been there the day before. Moreover, they observed that the row of flags had been moved to correspond with the location of the gas line that had been ruptured. Additionally, the original row of flags that had been at the scene since April had been removed. NIPSCO personnel had also arrived shortly after the explosion to isolate the gas valves on either side of the inferno. Two employees who typically located and marked gas lines on a daily basis remained at the scene.

On the morning after the fire, Van Keppel and Systma visited the accident site to take videos and photographs. Upon their arrival, both men noticed that the flags had been moved to the edge of the pond. They also observed that a new row of flags had been added marking the active gas transmission line which the bulldozer had struck. Van Keppel and Systma proceeded to locate a second pipe buried only four inches underground, and it was subsequently discovered that the bulldozer did not hit the gas transmission line that had been marked by the original row of flags. Systma eventually uncovered a total of four underground NIPSCO pipelines.

As a result of the incident, Cauffman suffered third degree burns to both arms and his ears. He also sustained second degree burns to his face, neck and scalp. During the course of a twenty-nine day stay in the hospital, Cauffman was given morphine and was taken to a debridement tank where the nurses and physicians cut away the skin from his body to prevent infection. Although

Cauffman eventually had a skin graft from his hip, his body remains disfigured. Cauffman also sustained lost wages in the amount of $18,437 and medical expenses totaling $51,491.57. G.V.K. indicated that its bulldozer had a value of approximately $200,000 prior to the incident. Following the explosion, G.V.K. determined that the bulldozer was a near complete loss, and it was eventually sold as scrap metal for only $600.

On November 12, 1991, G.V.K. filed its complaint for negligence against NIPSCO, alleging that it failed to properly mark the gas main on the Pivarnik farm. G.V.K. alleged that the bulldozer had been destroyed when it struck and ruptured the unmarked gas line. R. at 22. As a result of the explosion and fire, G.V.K. asserted that it lost the use of its equipment and requested damages for lost profits that would have been generated from the bulldozer's use. G.V.K. also asserted that subsequent to the explosion and fire, NIPSCO fraudulently changed, altered or added to the gas line markings it had previously installed which entitled them to punitive damages. Thereafter, on December 19, 1991, NIPSCO filed its answer denying the allegations of the complaint and initiated a counter-complaint against G.V.K., the Pivarniks and Cauffman, alleging that the terms of the easement had been violated by the bulldozing and other activity on the property. NIPSCO sought damages for the destroyed pipeline and lost gas. The Pivarniks then retained counsel to pursue a counter-complaint against NIPSCO for damages to the farm. Cauffman also filed a complaint against NIPSCO seeking damages for the injuries he sustained in the explosion while operating the bulldozer. Thereafter, Cauffman and Edward filed separate complaints against NIPSCO in alternate courts. These complaints were eventually dismissed and all matters were joined in this proceeding. On February 26, 1996, NIPSCO filed a motion for summary judgment, alleging that the Pivarniks had violated its easement rights as a matter of law. The trial court ultimately denied that motion.

NIPSCO eventually settled its counterclaim against G.V.K., and its claim for damages from the Pivarniks was settled and dismissed. On August 5, 1996, Cauffman moved to realign the parties so that G.V.K. and Cauffman would both proceed as plaintiffs against NIPSCO, and NIPSCO would be prohibited from proceeding as a plaintiff against Cauffman. A similar motion was made by the Pivarniks on September 30, 1996. The trial court ultimately ordered that G.V.K., Cauffman, and the Pivarniks be aligned as plaintiffs against NIPSCO and further determined that NIPSCO was to be the sole defendant in the action.

Prior to the commencement of trial, the court determined that each party was entitled to three peremptory challenges. The trial court also granted each party one peremptory challenge in selecting two alternate jurors.

Following an eight-day jury trial, G.V.K. was awarded judgment against NIPSCO in the amount of $180,000. Cauffman was awarded damages in the amount of $1,425,-000, and the Pivarniks were awarded $45,000 against NIPSCO. NIPSCO now appeals.

## DISCUSSION AND DECISION

### I. Alignment of Parties and Peremptory Challenges

NIPSCO first contends that the trial court erred in realigning the appellees as plaintiffs and in granting each of them four peremptory challenges during jury selection. Specifically, NIPSCO argues that such an order allowing the appellees a total of twelve challenges yet limiting NIPSCO to only four violated the provisions of Ind. Trial Rule 47(C)[2] and was so fundamentally unfair that the jury's verdict must be vacated.

■■■ We initially observe that matters which relate to the orderly conduct of trial are generally within the trial court's discre-

---

**2.** T.R. 47(c) provides in relevant part that:
(1) Each side shall have three (3) peremptory challenges.
(2) In addition to the peremptory challenges under subsection (1), each side is entitled to:

(a) one (1) peremptory challenge if the court directs that one (1) or two alternate jurors are to be impaneled; . . . .

tion. *See Archem, Inc. v. Simo*, 549 N.E.2d 1054, 1060 (Ind.Ct.App.1990), *trans. denied.* Moreover, a trial judge has control over the proceedings in his court, and his duty is to conduct business expeditiously and consistent with the orderly procedure and administration of justice. *Terpstra v. Farmers and Merchants Bank*, 483 N.E.2d 749, 761 (Ind. Ct.App.1985), *trans. denied.* This court will review the trial court's decisions regarding the orderly conduct of a trial for an abuse of discretion. *See Archem*, 549 N.E.2d at 1060.

■ We also note that when reviewing peremptory jury challenges to litigants in multi-party actions, this court has observed that Indiana aligns with the majority of American jurisdictions allowing separate sets of peremptory challenges to parties on the same side with antagonistic interests. *Christensen v. Sears, Roebuck & Co.*, 565 N.E.2d 1103, 1105 (Ind.Ct.App.1991), *trans. denied.* However, even if the trial court does not evaluate antagonism between the parties, including that which involves the relationship of a defendant and third-party defendant before allocating challenges, reversible error does not occur when harm does not result. *Id.* at 1106. Prejudice must be shown before reversal may be granted, and the complaining party has the burden of showing actual prejudice. *Hebel v. Conrail, Inc.*, 475 N.E.2d 652, 659 (Ind.1985).

■ In the instant case, the record demonstrates that the trial court's realignment of the claims and parties stemming from the explosion was performed in an effort to expeditiously and properly manage the order of proof at trial. Specifically, the alignment permitted each plaintiff to present its case-in-chief before NIPSCO, the owner of the gas main, could present its case. It is apparent that such an order served to eliminate undue juror confusion in hearing disjointed testimony and in reducing the possibility of recalling witnesses by each of the plaintiffs. Moreover, the trial court's realignment of the parties effectively minimized the potential length of the trial had NIPSCO been permitted to cross-examine the plaintiffs' witnesses on three separate occasions after counsel for each of the three sets of plaintiffs had conducted their direct examination. In light of

these circumstances, it is apparent that the trial court's decision to realign the parties was a proper exercise of judicial discretion in an effort to achieve judicial economy, effect the orderly administration of the trial, and to reduce the likelihood of any juror confusion that might have arisen. Thus, NIPSCO has failed to demonstrate error in granting the appellees' motions to realign the parties.

■ NIPSCO also maintains that it is entitled to a reversal in light of the provisions set forth in T.R. 47(c) which state that "each side shall have three peremptory challenges." While the trial court may not have evaluated the "antagonistic interests" of the parties before determining the number of peremptory challenges that each party should have received, *see Christensen, supra*, NIPSCO merely speculates that the jury selection process was tainted and unfair because of a lack of perfect quantitative equality in allocating challenges among the parties. Moreover, we note that NIPSCO did not exhaust the number of peremptory challenges to which it was entitled at trial. Specifically, the record reveals that NIPSCO excused two regular jurors and one alternate juror peremptorily. R. at 543. NIPSCO's bare assertion, without establishing actual prejudice, does not entitle it to a reversal. *See Christensen*, 565 N.E.2d at 1106. As a result, the trial court's decision allowing the appellees a total of twelve peremptory challenges did not constitute reversible error. However, we caution that the better alternative in these circumstances would have been for the trial court to have afforded NIPSCO the same number of challenges as that assigned to the appellees, along with a directive that those challenges were to be equally apportioned.

### II. Admission Of Expert Testimony

NIPSCO next claims that the trial court improperly admitted expert testimony regarding Cauffman's injuries because the appellees had failed to comply with its discovery request relating to those injuries. Specifically, NIPSCO asserts that it is entitled to reversal because it was denied the right to cross-examine an expert witness at trial in light of the expert's "surprise testi-

mony" which resulted from the appellees' failure to comply with the discovery request.

We first note that the admission or exclusion of evidence is a determination entrusted to the trial court's sound discretion. *Summit Account and Computer Service, Inc. v. RJH of Florida, Inc.,* 690 N.E.2d 723, 729 (Ind.Ct.App.1998), *trans. denied.* The trial court has broad discretion in determining the propriety of expert testimony and its decision can be reversed only for an abuse of discretion. *Donaldson v. Indianapolis Pub. Transp. Corp.,* 632 N.E.2d 1167, 1170 (Ind.Ct.App.1994). An abuse of discretion arises only when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances of the case or reasonable inferences to be drawn therefrom. *Summit Account,* 690 N.E.2d at 729.

In the instant case, the record reflects that on May 15, 1992, NIPSCO served a set of interrogatories upon Cauffman for the purpose of eliciting expert medical opinions regarding his injuries. R. at 875. One of the interrogatories requested the name and address of each health care provider, the examination dates, diagnosis, whether any disability rating was made and the amount that was being claimed for special damages. R. at 866–67, 869. In response, Cauffman attached a medical expense summary to his answers which identified the health care providers, the dates of treatment and the charges.

Notwithstanding Cauffman's response, NIPSCO complains that no opinions regarding any diagnosis or prognosis were furnished, and that Cauffman's failure to produce such information constituted a violation of the trial court's discovery order. NIPSCO further maintains that Cauffman's failure to disclose a need for future physical therapy or the evidence produced at trial alleging that he would incur special damages relating to future therapy also resulted in a discovery violation.

At trial, Cauffman elicited the trial testimony of Mary Mosliwa, who was Cauffman's occupational therapist. She was listed as a witness to be called at trial. R. at 568. Mosliwa testified about the post-occurrence treatments that she rendered to Cauffman, along with the need for future medical treatments and special damages arising from them. Mosliwa also conducted an impromptu examination of Cauffman before the jury in an effort to demonstrate his limited range of motion, R. at 1727, 1736–37, and further testified that Cauffman would benefit from "therapy for the rest of his life." R. at 1736. In light of this testimony, NIPSCO contends that permitting Mosliwa to testify as to Cauffman's current medical status and that he would benefit from future treatment was erroneous because it was never disclosed prior to trial.

Our review of the record reveals that the interrogatories requested information about the treatment rendered to Cauffman and the special damages that arose from that treatment. Moreover, one of the interrogatories sought information about health care providers including the nature of the treatment rendered to Cauffman, the cost and the diagnosis that was reached. R. at 868. At no time did NIPSCO request any information about Cauffman's ongoing medical treatments or needs. Notwithstanding NIPSCO's claim of error, we note that it never moved to continue the trial, which may have given NIPSCO the opportunity to depose Mosliwa and to prepare for her further cross examination. Moreover, no depositions were taken by NIPSCO of any of Cauffman's medical providers, and NIPSCO never made any pretrial motions seeking to compel further discovery. In light of NIPSCO's lack of specificity regarding its requests for pretrial discovery, we cannot say that the trial court erred in denying its motion to strike Mosliwa's trial testimony.

### III. Punitive Damages

We note that on September 30, 1996, NIPSCO moved to strike the appellees' claims for punitive damages and it also filed a motion in limine to exclude evidence of post-accident marking of the line as a remedial measure. The following day, the trial court denied both the motion to strike and the motion in limine. After hearing evidence regarding NIPSCO's

actions in re-marking the lines, however, the trial court ultimately granted NIPSCO's motion to strike the claim for punitive damages pursuant to its motion under Ind. Trial Rule 50. Notwithstanding this ruling, NIPSCO contends that the trial court erred in failing to grant its motion to strike the appellees' claim for punitive damages in a timely fashion. Specifically, NIPSCO asserts that the appellees' claim, based upon its alleged post-accident remarking of the gas line, barred the request for punitive damages as a matter of law because the introduction of evidence in an effort to prove those damages was prejudicial and amounted to reversible error.

 NIPSCO correctly observes that punitive damages cannot be awarded where there is no supporting claim for compensatory damages. *Bud Wolf Chevrolet, Inc. v. Robertson,* 519 N.E.2d 135, 137–38 (Ind. 1988). Additionally, punitive damages may be awarded only if there is clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, over zealousness, mere negligence, or other human failing. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993).

In the instant case, while the trial court ultimately denied the appellees' claim for punitive damages, NIPSCO maintains that it should have also granted its motion in limine with respect to the admission of evidence regarding its post-accident markings of the gas lines. Moreover, NIPSCO claims that the appellees' reference to the post-accident markings as a "deliberate cover-up," R. at 1020, resulted in prejudice which warrants reversal.

To resolve this issue, we first note the provisions of Ind. Evidence Rule 407:

When after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precau-

tionary measures, if controverted, or impeachment.

While NIPSCO claims that the provisions of Evid. R. 407 should have excluded the admission of any evidence relating to NIPSCO's conduct after the incident, we note that the plain language of the rule authorizes the admission of evidence regarding a subsequent remedial measure when it is offered for a purpose other than proving negligence or other culpable conduct. *Id.; see also Utley v. Healy,* 663 N.E.2d 229, 238 (Ind.Ct. App.1996), *trans. denied.*

In *Utley,* this court determined that testimony regarding the terms of a city work order regarding a stop sign that was allegedly obstructed was admissible for a purpose other than proving negligence, even if it was evidence of a subsequent remedial measure. *Id.* Specifically, we noted that the testimony was admissible to prove that the city was notified of the dangerous condition and, therefore, the city, rather than the defendant, was responsible for the accident. *Id.*

 Here, the evidence simply impeached NIPSCO's account of the pre-accident events, and demonstrated the feasibility of precautionary measures. As set forth in the *FACTS,* several eyewitnesses observed only one row of yellow flags present on the Pivarniks' property before the explosion occurred. On the day of the fire, one row of yellow flags in the center of the tractor path was noticeably visible to Cauffman, Systma, and two of the fireman. After the fire, NIPSCO left two gas pipeline locators at the scene for "security" purposes with their work vans which contained locating equipment and additional flags.

The next morning, Systma and Van Keppel discovered a new set of flags on the water's edge rather than in the middle of the tractor path. They further observed that the old set of flags had been removed except for one remaining flag in the woods.

Throughout the course of the proceedings, NIPSCO continuously asserted that it did not place a new set of flags next to the water in a different location than where the flags had originally been situated. R. at 548. The

trial court simply considered the evidence to make a determination as to whether the appellees met their burden of establishing a ground for the award of punitive damages. Such evidence was also properly admitted to demonstrate NIPSCO's motive of maliciousness or fraud in its attempt to cover up the pre-accident mismarking of its gas mains and shift the blame to the appellees. Therefore, as in *Utley,* the evidence here was relevant for purposes other than to show NIPSCO's negligence. Thus, NIPSCO has failed to show an abuse of discretion or prejudice resulting from the evidence, and the trial court did not err in granting NIPSCO's motion in limine after the jury had heard the evidence relating to the appellees' claim for punitive damages.

### IV. Summary Judgment

NIPSCO next argues that the trial court erred in denying its motion for summary judgment. Specifically, it maintains that the dredging and bulldozing by the Pivarniks was inconsistent with the language of the easement on the property. Therefore, NIPSCO asserts that it was entitled to judgment as a matter of law on its counterclaim against the Pivarniks.

### A. Standard Of Review

■■■ In reviewing the trial court's denial of summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 223 (Ind. Ct.App.1997). We do not weigh evidence, but will liberally construe the facts in the light most favorable to the nonmoving party. *General Motors Corp. v. Northrop Corp.,* 685 N.E.2d 127, 132 (Ind.Ct.App.1997), *trans. denied.* Summary judgment should be granted only when the evidence designated to the trial court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *City of Elkhart v. Agenda: Open*

*Government, Inc.,* 683 N.E.2d 622, 625 (Ind. Ct.App.1997), *trans. denied.* Summary judgment is rarely appropriate in negligence actions. *Houin v. Burger,* 590 N.E.2d 593, 596 (Ind.Ct.App.1992).

### B. Denial Of NIPSCO's Motion For Summary Judgment

NIPSCO urges that the Pivarniks breached the terms of the easement because their activities on the property "resulted in a reconfiguration of the surface and subsurface which threatened the pipeline's operation and integrity." Appellant's Brief at 33. As a result, NIPSCO cites *Holding v. I & M Elec. Co.,* 400 N.E.2d 1154, 1157 (Ind.Ct.App.1980) for the proposition that it was entitled to judgment as a matter of law because the designated evidence established that it was the Pivarniks who breached their duty in refusing to permit NIPSCO to enjoy the easement without interference, and that using the bulldozing equipment over the property constituted a use inconsistent with the easement as a matter of law.

In *Holding,* we affirmed the trial court's grant of a permanent injunction against a salvage enterprise from storing automobile bodies on the ground because it reduced the clearance of the utility's high voltage lines *Id.* at 1158. However, we also observed that:

> Any activity on the part of the owner of the servient estate which materially renders the operation of the line more dangerous to members of the public who may have occasion to come on to the easement, or be in the vicinity of the transmission line, is a use inconsistent with the use and enjoyment of the easement by the owner of the dominant estate, and is an encroachment. *Whether such encroachment occurs is a matter of fact in any particular case, to be determined by the trier from all of the circumstances.*

*Id.* (emphasis supplied); *see also Rees v. Panhandle Eastern Pipe Line Co.,* 176 Ind. App. 597, 614, 377 N.E.2d 640, 651 (1978) (whether a particular use of the land is an unreasonable interference is a question of fact for the jury).

■■■ Here, the evidence designated to the trial court showed that the Pivarniks cleared

brush from their pond in the vicinity of the utility easement, and had removed silt that had accumulated and filled the pond. While the language of NIPSCO's easement rights restricts the Pivarniks from erecting buildings and structures across certain areas of the property, there is no such restriction regarding the digging or restoration of a pond. In light of the designated evidence presented to the trial court, NIPSCO failed to show that the Pivarniks encroached on the easement as a matter of law. Rather, the determination as to whether the Pivarniks' activity in removing brush from the area and digging and dredging the pond is reserved for the factfinder. Thus, the trial court properly denied NIPSCO's motion for summary judgment.

NIPSCO also claims that summary judgment should have been entered in its favor because the Pivarniks did not adequately comply with our "notice to excavate" statute, IND. CODE § 8-1-26-16. Although NIPSCO maintains that any duty it owed to the Pivarniks was vitiated in light of their failure to give the requisite notice under the statute, the evidence designated to the trial court reveals that NIPSCO admitted receiving notification from the biologist who worked with the Pivarniks on the wetlands project, and it then undertook to flag the gas line in April of 1991. NIPSCO also received notice of the project from Daniel, whereupon he was informed that the flags had been placed on the property and there was no need to re-mark the lines. In examining this evidence which was designated to the trial court, there was no error in denying NIPSCO's motion for summary judgment because of the appellees' purported noncompliance with the "notice to excavate" statute.

### CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court did not err in realigning the parties or in granting the appellees a total of twelve peremptory challenges while limiting NIPSCO to only four. Additionally, we note that the trial court properly admitted the testimony of Cauffman's occupational therapist, Mary Mosliwa, and there was no error in permitting evidence of NIPSCO's purported subsequent remedial measures in re-marking the gas lines to come before the jury. Finally, we conclude that the trial court properly denied NIPSCO's motion for summary judgment.

Judgment affirmed.

RUCKER, J., and BROOK, J., concur.