

FILED

Feb 05 2020, 7:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Darren A. Craig
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

C. Gregory Fifer
F. Bradley Benson
Applegate Fifer Pulliam LLC
Jeffersonville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Duke Energy Indiana, LLC, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> J & J Development Company, LLC, <br><br> *Appellee-Plaintiff* | February 5, 2020 <br><br> Court of Appeals Case No. 19A-PL-735 <br><br> Appeal from the Clark Circuit Court <br><br> The Honorable Vicki L. Carmichael, Judge <br><br> Trial Court Cause No. 10C01-1508-PL-91 |

**Vaidik, Judge.**

## Case Summary

[1]     J & J Development Company, LLC ("J & J") purchased a piece of land with the intent of developing a residential subdivision.  Duke Energy Indiana, LLC ("Duke") owns an electric-transmission-line easement over the land, and J & J

has constructed certain improvements within the easement. Duke acknowledges that J & J is allowed to make some use of the land within the easement but contends that the improvements at issue unreasonably interfere with Duke's use of the easement. The trial court disagreed and granted summary judgment in favor of J & J. Duke appeals, and we reverse.[1]

# Facts and Procedural History

This appeal concerns land in rural Clark County, along State Road 60 near Sellersburg. At some point J & J became interested in acquiring the land for purposes of developing a residential subdivision called "The Plains of Millan." Since 1956, Duke or its predecessors have owned a 300-foot-wide electric-transmission-line easement ("Easement") over the land. The granting instrument provides, in relevant part, as follows:

ELECTRIC TRANSMISSION LINE EASEMENT

\*    \*    \*    \*

Grantors, in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations in hand paid to said Grantors, hereby grant unto Public Service Company of Indiana, Inc., an Indiana corporation, and its successors and assigns, Grantee, the perpetual right, privilege, easement and authority to enter upon the real estate hereinafter described and, now or in the future,

---

[1] We held oral argument in the Court of Appeals courtroom on December 19, 2019. We thank counsel for their helpful presentations.

there to construct, erect, maintain, operate, inspect, patrol, repair, replace, extend, renew and/or remove two (2) lines of metal towers supporting one or more electric transmission lines and one (1) line of wood poles or wood-pole structures supporting one or more electric transmission lines, together with the anchors, guys, wires, conductors, cables, insulators, appurtenances, and other appliances, fixtures and apparatus attached thereto, for the supply, transmission, distribution and/or delivery of electrical energy to the public in general, for light, heat, power, telephone and/or other purposes:

[property description omitted]

In constructing said lines, Grantee shall have the right to determine the exact location in said real estate where the supporting towers or poles of each of said lines are to be located; to erect, construct and maintain the necessary substructures for said towers or poles; and to mount upon and string between said towers, structures or poles the wires, cables, conductors, cross-arms, insulators, transformers, lightning arresters, disconnect switches, and other apparatus and equipment comprising, or reasonably appurtenant to, said electric transmission lines.

The Grantors reserve the use of the above described land not inconsistent with this grant, with the right to extend fences across the same. The Grantee shall not fence said land, but may put gates in any fences now or hereafter built thereon by the Grantors. Access to the above described land by way of established roads, lanes or driveways is hereby given. The Grantee may at any and all times trim, retrim, cut down or remove, without further payment, trees, bushes, saplings or other obstructions upon or extending over said land, so far as may reasonably be necessary in the construction, operation and maintenance of said lines.

The Grantee shall and will indemnify and save the Grantors harmless from and against any and all damages, injuries, losses, claims, demands or costs proximately caused by the fault, culpability, or negligence of the Grantee in the construction, erection, maintenance, operation, repair or removal of said electric transmission lines and the structures and appurtenances connected therewith.

Any damages to the crops, fences, gates, drains, ditches or buildings of the Grantors done by the Grantee in the erection, repair, replacement or renewal of said towers, poles, wires, cables or equipment, shall be promptly repaired, replaced or paid for by the Grantee, provided a claim therefore is presented with the Grantee at its General Office within thirty (30) days after such damages occur.

Appellant's App. Vol. V pp. 28-29.[2]

[3]     According to Duke (and undisputed by J & J), the Easement is part of a greater transmission corridor, and the transmission lines that run through the Easement play an important role in providing electricity to the area:

The transmission corridor contains two parallel lines of steel towers. One set of towers contains a six-wire uninsulated 138,000-volt (138 kV) circuit, while the other contains one 345,000-volt (345 kV) circuit.

*     *     *     *

---

[2] Duke says that a second granting instrument may be involved, but its language is almost identical to that quoted above. *See* Appellant's App. Vol. III pp. 120-21.

The 138 kV and 345 kV circuits in [Duke's] transmission corridor form part of the Bulk Electric System. The 345 kV circuit interconnects to Louisville Gas and Electric Company's Ghent and Trimble stations. An outage on that circuit can have a significant impact on the Louisville area. The 138 kV circuit feeds several New Albany substations and supports the Clarksville/Speed area if the 345 kV line is affected. Power carried on transmission lines is stepped down (reduced) at substations and carried on distribution lines at a lower voltage to customers.

Within approximately 100 yards of the Plains of Millan entrance, the 138 kV transmission lines feed the Hoosier Energy St. Joseph substation, which serves Hoosier Energy customers. The transmission lines that feed the Hoosier Energy substation feed into it "radially," meaning that the substation is fed by only those lines. Therefore, an occurrence or outage at or near what became the only entrance to Plains of Millan may impact a significant number of residential and business customers.

Appellant's Br. pp. 12, 14-15.

[4]  In 2013 and 2014, J & J hired a surveyor to prepare a plat for The Plains of Millan, sought and received plat approval from the Clark County Plan Commission, and then purchased the land—all without contacting Duke. Then, in 2015, J & J constructed certain improvements within the Easement: an entrance from State Road 60 (the only entrance to the planned neighborhood); a road with curbs (Palermo Street) running parallel to and largely within the Easement; detention basins (in which water ponds temporarily after rain); a fire hydrant; and buried utility lines. The following drawing shows the area at

issue, including the boundaries of the Easement and the locations of the electric towers and wires:



Again, J & J did not discuss the improvements with Duke before constructing them. J & J first contacted Duke about the project in July 2015, in relation to sewer work it wanted to do. Duke then inspected the improvements, concluded that they impermissibly encroach upon the Easement, and told J & J that they needed to be removed.

[5] Soon thereafter, J & J filed suit against Duke, seeking a declaration that its improvements do not unreasonably interfere with Duke's use of the Easement, among other relief. Duke filed a counterclaim, requesting a declaration that J & J's improvements are impermissible and an injunction requiring J & J to remove them and to refrain from constructing additional encroachments. On a motion for partial summary judgment by J & J, the trial court ruled that the improvements are permissible and granted declaratory relief in J & J's favor. Duke appealed, and we reversed, concluding that the trial court "made credibility determinations involving issues that were in dispute," which is improper at the summary-judgment stage. *Duke Energy Ind., LLC v. J & J Dev. Co.*, No. 10A04-1605-PL-1084, 2018 WL 1528546 *5 (Ind. Ct. App. Mar. 29, 2018).

[6] On remand, the parties filed new cross-motions for summary judgment. The trial court again concluded that the challenged improvements are permissible, granted J & J's motion for summary judgment on the parties' competing claims for declaratory and injunctive relief, and denied Duke's motion for summary judgment.

[7] Duke now appeals.

# Discussion and Decision

[8] Duke contends that the trial court should have granted summary judgment to it instead of J & J. We review motions for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). That is, "The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

[9] At the outset, the parties agree on two key points: (1) the language of the easement instrument is unambiguous and (2) the claims for declaratory and injunctive relief should be resolved on summary judgment, not in a trial. They ask us to review the facts in light of the easement language and Indiana easement law and decide which party is entitled to summary judgment.

[10] Another matter is not in dispute: J & J is entitled to make **some** use of the land within the Easement. As set forth above, the instrument in which J & J's predecessors granted the Easement to Duke's predecessor provides that "[t]he Grantors reserve the use of the above described land not inconsistent with this grant[.]" And Indiana law is clear that the owner of land subject to an easement (the servient estate) can use the property within the easement in any manner that does not unreasonably interfere with the use of the easement by the

easement owner (the dominant estate). *Howard v. United States*, 964 N.E.2d 779, 781 (Ind. 2012); *Rehl v. Billetz*, 963 N.E.2d 1, 6-7 (Ind. Ct. App. 2012); *see also* Restatement (Third) of Property (Servitudes) § 4.9 (2000) ("Except as limited by the terms of the servitude determined under § 4.1, the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude."). The only issue here, then, is whether J & J's improvements unreasonably interfere with Duke's use of the Easement. We hold that they do.

# I. Duke's Designated Evidence

[11] We begin by setting forth the designated evidence cited by Duke. Duke provides the following background, with no dispute from J & J:

> [Duke] acquires easements at the request of its transmission planning and engineering groups to secure the land rights needed to operate, maintain, repair, and replace electric transmission facilities. [Duke] obtains enough easement space to allow it to bring in large and multiple pieces of equipment to either install, replace, or repair its lines, locate the electric facilities and to enter and stage the equipment in the easement with minimal interference with surrounding property owners.

> [Duke's] obligation is to provide reliable and safe electric service. It is regulated by the Indiana Utility Regulatory Commission ("IURC"), and in the case of transmission lines, by the North American Electric Reliability Corporation ("NERC") and the Federal Energy Regulatory Commission ("FERC"), to which it must provide reports [] concerning the length of power outages. Penalties may be assessed for failing to restore power quickly, so [Duke] must have quick, safe, and unobstructed access to repair,

replace, or upgrade its facilities. Likewise, [Duke] is under a regulatory obligation to minimize the costs of repairs to easement property. Damage to structures or improvements in the easements increases the costs of services for all customers.

\*　　\*　　\*　　\*

[Duke] emphasizes and constantly works to ensure the safety of its customers, employees, and the public. [Duke] has studied how most safely to work on its facilities in easements, road rights-of-way, and in other locations, and how that work might affect employees and the public. As part of that process and over the course of years, [Duke] has learned not only how much easement space is needed to support its transmission facilities, but also how to work in that space effectively. [Duke] has also learned how structures and other developments in easements interfere with and present challenges to operating, maintaining, repairing, and replacing electric transmission facilities.

Appellant's Br. pp. 9, 15 (citations omitted).

[12]　Against that backdrop, Duke addresses the specific improvements at issue. Duke first notes that the sole entrance to The Plains of Millan neighborhood lies within the Easement and that, as such, it will be blocked, possibly entirely and for a lengthy period, when Duke does work in that area. Homeowners would be prevented from entering or leaving the neighborhood, and emergency vehicles would be delayed getting in and out of the neighborhood. Duke's work would be substantially more difficult if residents require access at the same place Duke is working or staging its work, requiring Duke to rearrange its equipment and personnel. If Duke needs to block the intersection, it will not be

possible to reroute traffic to permit access to the neighborhood without disrupting Duke's work. While it is possible for Duke to stop and move equipment, it is not possible to do so repeatedly or, sometimes, quickly. Stopping and moving cannot be done until work can be safely suspended and equipment and workers safely moved.

[13] Moreover, buried utilities, roads, and detention basins within the Easement can impede, and in some cases prevent, Duke from accessing part of its transmission corridor and facilities. Utilities should be run through easements as close to a perpendicular angle as possible, rather than in parallel, to prevent crushing them or creating water or gas emergencies. Repairs to the transmission facilities near The Plains of Millan would require the use of equipment weighing thousands of pounds. Repairs to the 138 kV circuits require bucket trucks, line trucks, and track equipment for off-road use. Repairs to the 345 kV circuits and towers typically require use of a boom truck, bulldozer, 125-foot track bucket truck, 100-foot bucket truck, two 93-foot bucket trucks, and a 4065 digger derrick. Duke may also need pressure-digger equipment and tri-axle dump trucks to perform excavation work. While the possibility of damaging utilities cannot be avoided entirely, utilities that cross easements at angles greater than thirty degrees are less invasive than if they run in parallel through the easements. Underground gas lines that run in parallel down an electric-transmission easement are more likely to suffer damage and, if not turned off, can create a dangerous situation. Likewise, where a road runs

across an easement, rather than parallel to it, Duke has more flexibility in placing replacement poles and appurtenances and staging vehicles.

[14] Among other things, easements are meant to ensure sufficient space to do repair work and install temporary facilities to restore electric service. Outages necessitate repairs and sometimes replacements, which may require temporary facilities that are spaced and placed differently from towers. Likewise, maintenance and replacement of aged facilities require substantial equipment and materials. The towers supporting the 138 kV circuit were installed in 1957, and the towers supporting the 345 kV lines were installed in 1978. When Duke needs to replace the tower closest to State Road 60, temporary wooden replacement structures will probably need to be placed in one of the detention basins J & J built or on Palermo Street. The presence of the road and the detention basins within the Easement can impair Duke's ability to place temporary structures at appropriate places.

[15] The equipment needed to do replacement work and upgrades typically comes in from both sides of an easement, so the ability to use the full Easement is imperative. Even a simpler repair, such as a middle splice, is more complicated, dangerous, and costly if the equipment cannot reach the lines effectively because of obstructions. Obstructions force Duke to work across a live set of lines and, therefore, require that those lines are taken out of service. Obstructions can make a simple splice of a line impossible (if, for example, a detention basin is directly under the splice area), necessitating a line replacement, which is costlier and takes more time.

Finally, fire hydrants located within easements create safety hazards. Because Duke uses very large equipment to build and maintain electric-transmission facilities there is a significant risk that fire hydrants will be damaged or ruptured during such work. If a fire hydrant is damaged near work on electric-transmission facilities, water can be released in a high-pressure arc and create an energized water flow.[3]

## II. J & J's Responses

J & J offers a variety of responses to Duke's claim of unreasonable interference, but they do not overcome Duke's designated evidence. J & J spends much of its brief taking issue with a Duke document entitled "Electric Transmission Right-of-Way Guidelines/Restrictions Valid for Ohio, Indiana and Kentucky." The document, which Duke sent to J & J after learning about J & J's improvements, begins by explaining, "This list of right-of-way restrictions has been developed to answer the most frequently asked questions about property owner use of Duke Energy's electric transmission rights of way." Appellant's App. Vol. III p. 40. The "restrictions" include the following: (1) structures, buildings, and other improvements "which in Duke Energy's opinion interfere with the electric transmission right of way are not allowed within the right-of way limits"; (2) streets and utility lines "shall not parallel the centerline within the right of way but may cross, from one side to the other, at any angle not less

---

[3] In its opening brief, Duke also makes passing reference to "slope changes," Appellant's Br. p. 19, but it does not give us further information about any such changes.

than 30 degrees with the centerline"; (3) intersections "are not permitted"; and (4) "Any drainage feature that allows water to pond, causes erosion, directs stormwater toward the right of way or limits access to or around Duke Energy facilities is prohibited." *Id.* Noting that the restrictions are not specifically set forth in the easement instrument, J & J contends that Duke is impermissibly attempting to "subject the servient estate to a greater burden than was originally agreed upon without the consent of the servient estate owner." Appellee's Br. pp. 26-27 (citing *Harlan Bakeries, Inc. v. Muncy*, 835 N.E.2d 1018 (Ind. Ct. App. 2005)). That is not the case. Duke does not assert that its "restrictions" are enforceable independent of the easement instrument. Rather, it acknowledges that the specified "restrictions" merely represent its interpretation of the general restriction stated in the easement instrument: "The Grantors reserve the use of the above described land **not inconsistent with** this grant[.]" (Emphasis added).[4]

[18] J & J also contends that its improvements do not unreasonably interfere with Duke's use of the Easement because "the transmission of electricity through the easement has not been obstructed[.]" Appellee's Br. p. 23; *see also id.* at 28 ("The proper test as to whether removal of any of the Subdivision infrastructure improvements should be compelled, however, is whether they themselves

---

[4] Given some of the definitive language Duke uses in the document—such as "are not allowed," "shall not," "are not permitted," and "is prohibited"—we understand why J & J misinterpreted Duke's position. Duke should reconsider such language, since it could mislead an unwitting recipient into believing that Duke's "restrictions" are legally binding and not just Duke's interpretation of the easement instrument.

operate to obstruct the transmission of electricity through the easement."). The problem with this argument is that, as Duke puts it, the Easement was obtained "not just to send electrons down conductors (wires) but to allow much more." Appellant's Reply Br. p. 8. Specifically, the easement instrument grants "the perpetual right, privilege, easement and authority to enter upon the real estate hereinafter described and, now or in the future, there **to construct, erect, maintain, operate, inspect, patrol, repair, replace, extend, renew and/or remove**" the wires, towers, poles, and attachments thereto. Appellant's App. Vol. V p. 28 (emphasis added). In short, the purpose of the Easement extends far beyond the simple transmission of electricity. Duke must also be able to move freely within the Easement to build and maintain the infrastructure that is necessary for the transmission of electricity.

[19] Regarding Duke's need to do maintenance work, J & J points out that Duke's "ability to maintain its facilities within the easement" has not, to date, been obstructed by J & J's improvements. Appellee's Br. p. 6. But as just noted, the easement instrument protects Duke's ability to do necessary work "now **or in the future**[.]" (Emphasis added). The fact that J & J's improvements have not yet hindered any of Duke's work by no means establishes that they will not do so in the future. To the contrary, Duke designated extensive evidence that J & J's improvements could seriously impair Duke's ability to perform maintenance and repairs in the future.

[20] Next, J & J contends that the improvements cannot be said to unreasonably interfere with the use of the Easement given that the easement instrument includes the following language:

> Any damages to the **crops, fences, gates, drains, ditches or buildings** of the Grantors done by the Grantee in the erection, repair, replacement or renewal of said towers, poles, wires, cables or equipment, shall be promptly repaired, replaced or paid for by the Grantee, provided a claim therefore is presented with the Grantee at its General Office within thirty (30) days after such damages occur.

Appellant's App. Vol. V p. 29 (emphasis added). Relying on this provision, J & J maintains that the easement instrument "expressly contemplated" that the grantor/servient owner could "subsequently construct improvements, including without limitation, 'crops, fences, gates, drains, ditches or buildings,'" within the Easement. Appellee's Br. pp. 23, 30. That is debatable. The cited language does not expressly allow the grantor to "construct" crops, fences, gates, drains, ditches, or buildings; it addresses only "damages" to crops, fences, gates, drains, ditches, or buildings, which could be a reference to existing improvements or improvements outside the Easement. The only new improvements **expressly** contemplated by the easement instrument are fences. Appellant's App. Vol. V p. 28 ("The Grantors reserve the use of the above described land not inconsistent with this grant, **with the right to extend fences across the same**." (Emphasis added)). But even if we accept J & J's contention that the easement instrument specifically allows the construction of crops, fences, gates, drains, ditches, or buildings within the Easement, that would not

mean that J & J is free to construct any such improvements it pleases. That is, J & J can only construct improvements that are "not inconsistent" with the grant of the Easement, i.e., improvements that do not unreasonably interfere with the use of the Easement. Therefore, the language relied upon by J & J does not answer, but rather begs, the question before us: do the specific improvements J & J actually constructed unreasonably interfere with Duke's use of the easement?

[21] J & J notes that to the south of the Easement there is a paved driveway from State Road 60 to the home of one of its vendors—identified on the above drawing as "ASPHALT DRIVEWAY TO MILLAN HOUSE." According to J & J, this driveway has "previously served as [Duke's] sole improved access point to the property" and "would remain in place after completion of the Subdivision in a manner that it could continue to provide [Duke] with access to the easement in the event needed." Appellee's Br. p. 26. For two reasons, the existence of that driveway is irrelevant to our analysis. First, J & J does not direct us to any evidence that Duke has an enforceable right to use the driveway, which, as the drawing shows, comes off of State Road 60 at a point outside the Easement. Second, even if we assume that Duke can use the driveway in perpetuity, the fact that the driveway allows **access to** the Easement does not change the fact that J & J's improvements hinder Duke's ability to do work **once it has accessed the Easement**.

[22] J & J emphasizes that the challenged improvements are in compliance with the National Electrical Safety Code. However, as Duke notes, we have held that

compliance with the NESC "is only one of the factors to be considered" in determining whether an impermissible encroachment exists and "is not of and to itself determinative." *Holding v. Ind. & Mich. Elec. Co.*, 400 N.E.2d 1154, 1158 (Ind. Ct. App. 1980). Indeed, in *Holding*, we affirmed the trial court's finding of such an encroachment notwithstanding compliance with the NESC.

[23] J & J also directs us to the affidavit of David Broady, the owner and operator of a company that performed work for The Plains of Millan, including the construction of Palermo Street, the installation of underground utilities, and the installation of the detention basins. Broady stated that he has operated "heavy construction equipment" for more than fifty years and that such equipment could be used within the Easement without damaging buried utilities. Appellant's App. Vol. VI pp. 124, 125. But as Duke notes, Broady "did not testify that he operated utility equipment of the size and weight used to work on electric facilities[.]" Appellant's Br. p. 28. Therefore, we agree with Duke that Broady's affidavit "does not create an issue regarding transmission-line maintenance and the risk that electric utility equipment poses to underground gas and water lines." Appellant's Reply Br. p. 15.

[24] J & J points out that Duke failed to seek judicial review of the Clark County Plan Commission's approval of the primary plat and seems to argue that, as a result, Duke "waived" its right to challenge the improvements. Appellee's Br. pp. 39-43. Setting aside the fact that J & J did not contact Duke about its plans until after the plat had already been approved (J & J says Duke was only entitled to notice by publication), J & J offers neither relevant authority nor

cogent reasoning in support of its waiver argument, as required by Indiana Appellate Rule 46(A)(8)(a). J & J quotes extensively from our Supreme Court's decision in *Louisville & Indiana Railroad Co. v. Indiana Gas Co.*, 829 N.E.2d 7 (Ind. 2005), but that opinion says nothing at all about approval of plats, or judicial review, or waiver. J & J has not convinced us that Duke's failure to seek judicial review of the plat approval impacts its ability to challenge the improvements.

[25] Finally, J & J argues that its position is supported by four decisions from this Court. We disagree.

[26] The first case J & J cites is *Holding*, which we mentioned above. There, an auto-salvage business had spread fill dirt in an electric-transmission easement, "thereby decreasing the clearance between the ground and the wires." *Holding*, 400 N.E.2d at 1156. The trial court granted an injunction requiring the business to "remove an amount of fill dirt beneath the cables in order that a minimum clearance of 22 feet would be reestablished." *Id.* We affirmed, explaining that any less clearance would pose an unacceptable threat to public safety. *Id.* at 1158. J & J asserts, "Unlike in *Holding*, the infrastructure improvements constructed by J & J Development pose no public safety concerns warranting their removal to any extent." Appellee's Br. p. 29. In support of this argument, J & J notes that its improvements comply with the NESC. But we rejected a similar argument in *Holding*. Specifically, the auto-salvage business argued that twenty-two feet of clearance exceeded the requirements of the NESC, and we nonetheless upheld the injunction requiring

twenty-two feet of clearance, observing that the NESC "is not of and to itself determinative[.]" *Holding*, 400 N.E.2d at 1158. As such, J & J's reliance on *Holding* is misplaced.

[27] J & J also cites our decision in *Northern Indiana Public Service Co. v. G.V.K. Corp.*, 713 N.E.2d 842 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. In that case, landowners struck and ruptured a gas line while using a bulldozer within a pipeline easement. Specifically, they were "clear[ing] brush from their pond in the vicinity of the utility easement" and "remov[ing] silt that had accumulated and filled the pond." *Id.* at 850-51. The gas company claimed that the bulldozing violated the terms of the easement. The trial court denied the gas company's motion for summary judgment on that claim, and we affirmed, noting that while the language of the easement instrument restricted the landowners "from erecting buildings and structures across certain areas of the property, there is no such restriction regarding the digging or restoration of a pond." *Id.* at 851. J & J contends that just as we ruled against the gas company we should rule against Duke because "the easement instrument permits both 'buildings' and 'drains'." Appellee's Br. p. 32. But as we explained above, even if the easement instrument expressly allows buildings and drains (which is debatable), J & J cannot construct any such improvements it wants— improvements that unreasonably interfere with Duke's use of the Easement are prohibited.

[28] Next, J & J cites *Drees Co. v. Thompson*, 868 N.E.2d 32 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*, where we held that a residential ingress-and-egress

easement would not be unreasonably interfered with as a result of the development of the surrounding area, even though the development would lead to increased traffic on and over the easement. J & J urges a similar result in this case. But in *Thompson*, we explicitly emphasized the difference between an ingress-and-egress easement and an electric-transmission easement, explaining that in the case of an electric-transmission easement "it would be reasonable to prevent servient estate owners from taking any action that increases the risk in the dominant estate owner's operation of the inherently dangerous utility." *Id.* at 43. Because the case before us involves an electric-transmission easement rather than an ingress-and-egress easement, *Thompson* does not help J & J.

[29] The last case J & J cites is *Duke Energy of Indiana, LLC v. City of Franklin*, 69 N.E.3d 471 (Ind. Ct. App. 2016), where Duke claimed that the City of Franklin's planned expansion of an intersection would interfere with Duke's use of an electric-transmission easement, primarily because of the need for traffic-control measures, including road closures, during repair and maintenance work. The trial court rejected that claim, and we affirmed, emphasizing that the most likely maintenance would require traffic-control measures regardless of whether the expansion was allowed. *Id.* at 484-85. For three reasons, *City of Franklin* is distinguishable from this case. First, in *City of Franklin* we treated the parties not as a dominant estate and a servient estate but rather as co-owners of an easement, and therefore we considered the "reasonable necessity" of the City's proposed work, *id.* at 483-84, something that is not at issue here. Second, *City of Franklin* concerned the expansion of an

intersection that had existed for many years, whereas this case involves the construction of all-new improvements. And third, in *City of Franklin*, it was possible to reroute traffic if the intersection had to be closed, whereas the intersection at issue here would be the sole access to the Plains of Millan neighborhood, so closing it could cause major problems for both Duke and the residents.

[30] For all these reasons, we conclude that J & J has failed to meaningfully rebut Duke's designated evidence that the challenged improvements, taken together—the sole entrance to the subdivision, the road and the buried utilities running parallel within the Easement, the detention basins, and the fire hydrant—unreasonably interfere with Duke's use of the Easement. We therefore reverse the trial court's grant of summary judgment in favor of J & J and remand for the entry of summary judgment in favor of Duke, including an injunction requiring J & J to remove the challenged improvements. We recognize that this may strike some as a harsh result. But as we have said, a landowner who constructs improvements on an easement—especially without consulting the easement holder—does so "at their peril." *Panhandle E. Pipe Line Co. v. Tisher*, 699 N.E.2d 731, 739 (Ind. Ct. App. 1998).

[31] Reversed.

Riley, J., and Bradford, C.J., concur.